STATE OF NEBRASKA, APPELLEE, v. JOSEPH SANCHELL, APPELLANT.

216 N. W. 2d 504

Filed March 21, 1974.　　No. 39042.

Paul E. Watts, J. Joseph McQuillan, Bill Campbell, Gerald E. Moran, and George R. Sornberger, for appellant.

Clarence A. H. Meyer, Attorney General, and Chauncey C. Sheldon, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

CLINTON, J.

Defendant was charged on one count of forcible rape and three counts of robbery, and was found guilty by a jury. The offenses occurred during the early morning hours of January 22, 1972, in a women's residence hall on the campus of the University of Nebraska. The victims were three female students who resided in the hall. The convictions depended solely upon identification of the defendant by the victims. There was no circumstantial or other evidence to connect the defendant with the offenses.

Previous to trial two issues of significance on this appeal were raised. The defendant moved to dismiss the information because the State, acting through the prosecuting attorney, had violated an agreement with the defendant to dismiss the charges if the defendant submitted to and "passed" a polygraphic examination. The court denied the motion. The defendant also moved to suppress the identification testimony of the witnesses

because it was alleged they were the product of constitutionally tainted pretrial identifications which were so unnecessarily and impermissibly suggestive as to give rise to a substantial likelihod of irreparable misidentification in violation of the mandates of Gilbert v. California, 388 U. S. 263, 87 S. Ct. 1951, 18 L. Ed. 2d 1178; United States v. Wade, 388 U. S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149; Stovall v. Denno, 388 U. S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199; and Foster v. California, 394 U. S. 440, 89 S. Ct. 1127, 22 L. Ed. 2d 402; and thus defendant was denied due process of law at his trial. A suppression hearing was held on the motion and the trial court denied the motion without making any fact findings.

On this appeal the following errors are assigned: (1) The identifications should have been suppressed because the defendant was denied assistance of counsel at a one man showup on February 8, 1972. (2) One man showups on February 8 and March 1 and 2, 1972, violated principles of due process of law. (3) The identifications made at trial by the witnesses had no origin independent of the tainted identifications and therefore should have been suppressed. (4) The court should have granted the motion to dismiss because the State breached its agreement to dismiss if the defendant passed the polygraphic examination. (5) The erroneous admission by innuendo of the fact that the defendant had taken a polygraphic examination. (6) The evidence was insufficient to sustain the verdict.

Three of the assignments may be dealt with summarily.

The showup of February 8, 1972, occurred prior to the time any complaint in the matter had been filed against the defendant. Kirby v. Illinois, 406 U. S. 682, 92 S. Ct. 1877, 32 L. Ed. 2d 411, makes it clear that the right to counsel does not attach until at or after the time adversary proceedings commence and that these

begin with the formal charge. The court in that case specifically held the accused was not entitled to counsel at a police station showup which occurred before the defendant had been formally charged. The first assignment is therefore without merit.

The fifth assignment is likewise unmeritorious. No reasonable inference can be drawn from the trial record which could lead the jury to conclude the defendant had taken a polygraph test. The record shows the rape victim took such a test for the purpose of determining the truth of her claim that an offense had been committed. The same police officer who administered that test was called later as a rebuttal witness to testify concerning a conversation had with the defendant. There was nothing in this testimony to indicate by any reasonable intendment that the conversation was related to a polygraph test. In any event, there was no objection to the testimony and no motion for mistrial.

The merits of the sixth assignment depend upon whether the identification testimony must be stricken in its entirety. Since we conclude that some but not all this testimony is admissible, a jury question on the credibility and accuracy of the identification testimony was presented. The sixth assignment is not well taken.

After the preliminary hearing it was agreed, in letters dated May 4 and May 9, 1972, between the defendant's lawyer and the member of the county attorney's staff charged with prosecuting the case, that if the defendant passed a polygraph test the charges would be dismissed. The prosecutor stated: "The only reservation that I would have is that in the event the Lie Detector Tests would be inconclusive, that the charges would not be dismissed." In no event were the results to be used if the case proceeded to trial. The tests were administered on June 21, 1972, by a member of the Lincoln police department who was a qualified polygraph examiner. Immediately following the examination the

examiner told the defense counsel that his client had passed the tests. However, when the written report was made to the prosecutor, he stated: "His reactions on a normal individual who had never been involved in this type of offense would indicate an innocent man, however, the reaction on the polygraph on this subject with his experience in thefts and other activity, indicate to me, that in my opinion that he is the guilty party."

At the hearing on the motion to dismiss because of the violation of the agreement, the examiner testified: "Q. Sir, in reaching the conclusion after you said on a normal person he would pass, you used extraneous matters not included in the test to draw the conclusion he wasn't telling the truth? A. Yes. . . . I told Mr. Watts here I honestly thought he had passed it; but I should not have said that. . . . Q. I will restate it. The test itself, excluding the extraneous matter, he passed? A. Yes."

The extraneous matters considered by the examiner were conclusions based largely on hearsay information about "his [the defendant's] experience in thefts and other activity." It is our conclusion that the defendant passed the test within the meaning of the agreement. It certainly contemplated no considerations extraneous to the tests and involving the subjective judgment of the examiner on matters unrelated to the defendant's guilt or innocence of the crimes charged.

The question is: Is the agreement enforcible? The defendant cites and relies on Butler v. State, 228 S. 2d 421, 36 A. L. R. 3d 1274 (Fla. App., 1969); and State v. Davis, 188 S. 2d 24 (Fla. App., 1966). In these cases the court held a refusal to honor the agreements deprived the defendants of due process of law and the convictions were reversed and the charges ordered dismissed. The agreements in those cases were somewhat different than in the present instance. In the Davis case the defendant was charged with first degree mur-

der. It was agreed that if the defendant passed the test the charge would be dropped and that if he failed he would plead guilty to manslaughter. If the test were inconclusive, neither side was bound. In Butler the charge was rape. The agreement was that if the defendant passed the test the charges would be dismissed. If he did not the results could be admitted in evidence against him. In both cases the agreements had been approved by the trial court.

We do not want to do anything to discourage the use of the polygraph as it is a useful tool in police and prosecutorial work and no doubt results in many determinations not to prosecute. It is our judgment that such an agreement, as in the present instance, requires court approval to be binding. Section 29-1606, R. R. S. 1943, provides that after preliminary examination the county attorney is required to file an information and if he determines he should not do so he must seek court permission and justify his action. If permission is denied he must then file the information and bring the matter to trial. The reasonable construction of this statute is that it requires approval of the court to dismiss an information once it has been filed. In this case the court denied approval. The agreement was not binding without court approval.

The second and third assignments are related and will be dealt with together. The determination of those assignments requires a summary of certain portions of the evidence, insofar as it relates to the identifications allegedly tainted by the suggestive showup and to the related question of whether or not the evidence discloses that the in-court identifications have sources independent of the taint. This summary is also relevant to the question we will determine later of whether any error is harmless beyond a reasonable doubt. We will first, however, state the applicable legal principles.

In United States v. Wade, *supra,* the United States

Supreme Court held that an in-court identification by a witness to whom the accused was exhibited in a post indictment lineup in the absence of counsel must be excluded unless it could be established that such identification evidence had an origin independent of the tainted lineup or that error in its admission was harmless. In Gilbert v. California, *supra,* the same question was presented as in Wade but an additional factor was present. There the trial court had admitted, apparently as substantive proof of identity, testimony by the identifying witness that the witness had at a tainted pretrial lineup identified the defendant. The court held that this constitutional error required (1) the testimony concerning the lineup identification be excluded, and (2) the in-court identification be excluded, without regard to the question of whether the in-court identification had an independent source. Stovall v. Denno, *supra,* established a "due process test" for identification issues as follows: If the "confrontation . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification" the defendant has been "denied due process of law. . . . However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it."

The latest applications of the principles by the United States Supreme Court are in Foster v. California, *supra,* and Neil v. Biggers, 409 U. S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401. In Neil v. Biggers, *supra,* the court summarized the development of the applicable principles in the following way: "We have considered on four occasions the scope of due process protection against the admission of evidence deriving from suggestive identification procedures. In Stovall v. Denno, 388 U. S. 293 (1967), the Court held that the defendant could claim that 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law.'

Id., at 301-302. This, we held, must be determined 'on the totality of the circumstances.' We went on to find that on the facts of the case then before us, due process was not violated, emphasizing that the critical condition of the injured witness justified a showup in her hospital room. At trial, the witness, whose view of the suspect at the time of the crime was brief, testified to the out-of-court identification as did several police officers present in her hospital room, and also made an in-court identification.

"Subsequently, in a case where the witness made in-court identifications arguably stemming from previous exposure to a suggestive photographic array, the Court restated the governing test:

" '[W]e hold that each case must be considered on its own facts, and that convictions based on eye-witness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' Simmons v. United States, 390 U. S. 377, 384 (1968).

"Again we found the identification procedure to be supportable. . . .

"The only case to date in which this Court has found identification procedures to be violative of due process is Foster v. California, 394 U. S. 440, 442 (1969). There, the witness failed to identify Foster the first time he confronted him, despite a suggestive lineup. The police then arranged a showup, at which the witness could make only a tentative identification. Ultimately, at yet another confrontation, this time a lineup, the witness was able to muster a definite identification. We held all of the identifications inadmissible, observing that the identifications were 'all but inevitable' under the circumstances. Id., at 443. . . .

"Some general guidelines emerge from these cases as to the relationship between suggestiveness and misidentification. It is, first of all, apparent that the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.' Simmons v. United States, 390 U. S., at 384. While the phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of 'irreparable' it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself. It is the likelihood of misidentification which violates a defendant's right to due process, and it is this which was the basis of the exclusion of evidence in Foster. Suggestive confrontations are disapproved, because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the chance of misidentification is gratuitous. *But as Stovall makes clear, the admission of evidence of a showup without more does not violate due process.*

"What is less clear from our cases is whether, as intimated by the District Court, unnecessary suggestiveness alone requires the exclusion of evidence. While we are inclined to agree with the courts below that the police did not exhaust all possibility in seeking persons physically comparable to respondent, we do not think that the evidence must therefore be excluded. . . . Such a rule would have no place in the present case, since both the confrontation and the trial preceded Stovall v. Denno, supra, when we first gave notice that the suggestiveness of confrontation procedures was anything other than a matter to be argued to the jury.

"We turn, then, to the central question, whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be

considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. Applying these factors, we disagree with the District Court's conclusion." (Emphasis supplied.)

It appears to us that in Neil v. Biggers, *supra*, the court has implicitly, although not expressly, overruled the per se exclusionary rule of Gilbert v. California, *supra*, under which, if the prosecution on its direct case bolsters an in-court identification by evidence of an identification at a pretrial confrontation violative of due process standards, a reversal of the cause and exclusion of the identification evidence is mandatory. This seems true because in Neil v. Biggers, *supra*, the evidence consisted in part of testimony concerning the victim's visual and voice identification at a suggestive showup. Our conclusion is reinforced by the fact that in Foster v. California, *supra*, the court did not rely upon the per se exclusionary rule even though the cause came to it for direct review rather than by way of a habeas corpus proceeding.

We now summarize the evidence surrounding the showup of February 8, 1972. We will refer to the identifying witnesses by their first names. Renee was the victim of a rape and a robbery. These crimes took place and occupied the time between 5:30 and 6:15 a.m. Patricia was a robbery victim and that crime took place about 6:30 a.m. Ann was the victim of a robbery. The time of this offense is not fixed with reference to the hours of the clock, but circumstances indicate it occurred during about the same time span. The coincidence of time, methods used, and general description of the perpetrator by the witnesses would tend to prove that all

the offenses were committed by one person.

Complaint was promptly made and the matter was investigated by the campus police and the Lincoln police department. As a result of an interview with Renee a composite line "drawing," front view, of the attacker's face was made by one of the officers with the aid of an identikit. This kit consisted of transparent overlays of portions of facial outline and features. Laid one over the other they make a complete drawing. A photograph of the result was taken and it is preserved in the record. It shows a rather broad-faced, wide-nosed, clean-shaven, male with Negroid features, a medium Afro cut, and moderate sideburns. It is apparent it could be used not to identify a particular individual but only to note a resemblance and a possibility of identity. Shortly after the incident Renee was shown pictures of football players apparently from a game program. This was done because she stated that the attacker wore a red and white athletic jersey with the numeral 41 on it. She made no identification, but picked out a couple of pictures of individuals who resembled the attacker. Some time later she was shown 10 mug shots of black males. A photo of the defendant was not among these. She picked out three. Later the picture of the composite was seen by an officer of the Lincoln police department. He stated that a black resembling the drawing had been in jail some time earlier. This was the defendant. Mug shots of the defendant were then shown to Renee. She added this picture to the list of those bearing a resemblance. Whether or not the defendant's picture was shown to her separately or together with the same pictures previously shown is not clear from the record.

The other victims viewing the same photographs picked out two pictures bearing a resemblance. Neither picked the defendant's picture. Only one picture did Renee and the other two girls choose in common. All

this occurred within a day or so of January 22, 1972.

On February 8, 1972, the defendant was to be arraigned on an unrelated charge, presumably the one for which he had been in custody earlier. The three victims and two other girl students who had seen an intruder in the residence hall about the same time were taken by an officer of the campus police to the county courtroom where the arraignment was to take place. The witnesses sat together during the proceedings. The testimony of the three victims as to their understanding of the purpose for which they were taken there is in some significant respects contradictory. At the suppression hearing Renee testified on direct examination: "We were told that we were to come in and sit down and just observe what happened and then later someone was going to question us about what we saw." On cross-examination after some prodding, she acknowledged that she had at the preliminary hearing testified that she had been brought to court on February 8 for the purpose of identifying "the person who attacked you." Patricia testified that Renee told her they were there to identify some man. After the showup on February 8 Renee made an identification of the defendant as her attacker and then identified him at the preliminary hearing. On cross-examination at the suppression hearing she stated: "I was told at some time that they had a person that they thought had raped me, but I am not saying on what occasion I was told this, because I don't remember when I was told." Her previously mentioned admission as to her testimony at the preliminary hearing shows the suggestion was made before her identification on February 8. The statement by the police, whenever made, was clearly suggestive since the police had no evidence at any time other than the witness' identification and no identification had been made until after the showup on February 8. If the suggestion was made previous to February 8, it

was of course unfounded. If it was made later then it had to be made on the basis of her own identification and could only have been intended to reinforce it.

Patricia testified on direct examination at the suppression hearing that she did not know why she was there on February 8. She made no identification of the defendant as the perpetrator immediately thereafter. The night before the suppression hearing on January 24, 1973, 1 year and 1 day after the crime, she first advised the prosecutor that she would make a positive identification. At the suppression hearing she testified on cross-examination: "I told him last night that I was going to identify him today." On direct examination she had answered the following leading question in the affirmative: "Now, . . . from the observation which you made in your room of this particular individual and observations which you made in the County Courtroom at the preliminary hearing in this matter and from hearing the defendant speak here in the courthouse today do you have an opinion as to whether or not the person that was in your room on the early morning of January 22nd, 1972, is here in the courtroom today?" She then identified the defendant as the man. On cross-examination she admitted that at the preliminary hearing she testified that he "fits the description." She testified that she had never heard his voice until the suppression hearing. It was the night before the suppression hearing that she decided she would testify positively that the defendant was the robber. She admitted that at the preliminary hearing she could not identify him because she had not seen his whole features at the time of the crime. She also acknowledged that she had told a police officer she "could not identify the person that robbed [her]".

The prosecutor stated to the court at the suppression hearing that he knew of no witness other than Renee

and Patricia who would positively identify the defendant as the party responsible.

Officer Jacobson of the Lincoln police department was called. He testified that Renee told him that she "couldn't identify positively . . . she said perhaps she could recognize the voice or a voice but she wasn't certain about the face." He admitted that he had written in his reports, apparently after the defendant was under suspicion, she "could not definitely identify him as being the party responsible." Also: ". . . she told you that she could not definitely identify the man that assaulted her? A. Yes." This testimony was attempted to be explained on cross-examination as follows: " 'So that when she was telling you that she could not identify the person who had assaulted her did that simply mean that she did not know who it was?' A. Yes." On redirect he reiterated his earlier quoted testimony.

Officer Edmunds of the campus security force testified relative to Renee as follows: She "said that if she . . . could see him that she thought she could identify him."

We now turn to the testimony at trial especially with reference to the opportunity for observation as both the United States Supreme Court and this court have emphasized the importance of this item in the determination of the question of whether the in-court identification has a source independent of the tainted identification.

Renee was awakened by a hand placed over her mouth. She saw a very large, black face very close to her face. She heard a threat: "If you look at me I will kill you." She then looked away, but was unable to resist looking back and turned her eyes toward the person. The same threat was repeated. She then covered her eyes with her hands because she was so scared she could not close her eyes. She was then blindfolded, the lights were turned on, the door was locked, and two acts of rape were accomplished through threats of death. While the acts

were occurring she, peering from underneath the blindfold, caught glimpses of parts of the attacker's features. It was in this way that either before or after the attacks she observed the athletic jersey and the numeral thereon. Her earlier brief views of the defendant's facial features were made in an unlighted room with drapes drawn, but she stated: ". . . it was early morning light coming in the windows." Following the attack the perpetrator carried on a rather lengthy conversation with Renee. She testified when asked whether there was any question in her mind about the identify of her attacker: "None whatsoever." At trial she testified to identification on February 8, 1972, and at the preliminary hearing.

Patricia was awakened when someone jumped or "lurched" on her. "It was a black — big, black man, and I — I just stared at him for about three seconds and then — " she closed her eyes because of his threats. She was blindfolded. The blindfold covered her eyes and she did not see him thereafter. At trial she made a positive identification of the defendant as the robber. The event she described transpired before 6:30 a.m. She stated she was able to see because it was not real dark. It was "just starting to get light. The sun I think was just beginning to rise. There was some sunlight. And there are floodlights from the dormitories . . . ." She admitted on cross-examination a prior inconsistent statement about artificial light. She also admitted that at the preliminary hearing she had testified: " 'Do you say it's him?' " Answer: " 'I can't say it's him because I didn't see his whole features, but it fits what I saw.' " She further admitted that at the preliminary hearing on March 1 and 2 she had not identified the defendant as the man. She included the defendant's voice as part of her identification, but as already noted, she had agreed to make a positive identification before she had ever heard the voice.

Two witnesses other than the three victims were called. Mary Ann could not identify him. "Well, he was very close to me, but it was dark . . . [he was] very big . . . his hand . . . was dark-skinned." She stated that the defendant appeared to be about the same size. The events in her room occurred between 6 and 6:30 a.m. Sharon testified: ". . . there was a man standing in the doorway . . . . He was a black man . . . over six foot, like six . . . three." She could not distinguish his facial features. She observed him for about 10 seconds.

Ann, the third robbery victim, had an opportunity to view a mirror image of the intruder in full artificial light although briefly. The robber had forced her from her bed, he was standing behind her, and she was facing away from him. She had been instructed to keep her eyes closed. He turned the lights on. She saw his face in a mirror. She realized he saw her eyes were open and she immediately closed them. She estimated her observation took about 2 seconds. She testified that the defendant fit the size and general description of the man who was in her room. She saw "the eyes and the outline of his face; and those fit." She had heard the defendant's voice at the suppression hearing for the first time. She stated: "It was — it was a voice I had heard before. Q. In your room on January 22nd, 1972? A. Yes." On cross-examination she said when questioned concerning the identification of the defendant as the robber: "I am saying that I think it is?" She admitted that her testimony at the preliminary hearing was: "I can't say definitely whether it's him or not, but it could be."

In the brief of the defendant our attention has been called to various inconsistencies, other than those which we have mentioned, between the testimony of an identifying witness at trial and at preliminary hearing and between that on direct and cross-examination. How-

ever, those items at most raise questions of reliability
of observation and credibility which are for the jury
to decide.

It is also pointed out that at Lincoln, Nebraska, on
January 22, the sun does not rise until 7:43 a.m., central
standard time, and that there could have been no "early
morning light" until about 7 o'clock a.m. These facts,
of course, are scientific facts of which we may take
judicial notice as can the trial court. However, this
again raises only questions of reliability or credibility.
For example, in the case of Renee, even though she was
mistaken as to the source of whatever light there was,
it nonetheless appears that she could see well enough to
give a description sufficient to make a composite re-
sembling the attacker. It also appeared that the attacker
could see her well enough even in the darkened room
to note that she was looking at him and observing him
and thus gave her a second warning. This would indi-
cate, of course, that she could see him equally well.

Our conclusion is that the evidence shows the identi-
fication by Renee had a source independent of the ar-
ranged showup on February 8, 1972, and is sufficiently
reliable so that the strictures of the pertinent rules are
satisfied. In connection with the "identification" by
Ann, it appears that she was not in fact testifyng posi-
tively as to identity. The facts pertaining to her testi-
mony were all before the jury. It presents again only
questions of reliability and credibility and these were
clearly for the jury to decide.

On the other hand, we believe that the evidence we
have set forth conclusively shows that the identification
by Patricia was the product of the tainted showup on
February 8, 1972, and the suggestive circumstances
which preceded and followed it. It was not based upon
her observations at the time of the crime. It must there-
fore be excluded. We find the implicit determination
of the trial court that it had an independent origin to

be clearly wrong. Therefore on retrial in accordance with principles of Foster v. California, *supra,* and Neil v. Biggers, *supra,* the identification testimony of Patricia will not be admitted. This, of course, does not mean that she may not testify to the fact that she was robbed, but she simply will not be permitted to testify that the defendant was the perpetrator.

It is evident from what we have said that we have been unable to conclude that the refusal of the trial court to suppress the identification testimony of Patricia was harmless error beyond a reasonable doubt. Chapman v. California, 386 U. S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, 24 A. L. R. 3d 1065.

We now turn to the contention relative to an alleged showup on March 1 and 2, 1972. That was not a showup at all. It was the preliminary hearing on the charges filed after defendant had been identified by Renee. The facts and circumstances surrounding the hearing are not shown except by isolated references in cross-examination to the testimony of the witnesses given at the preliminary hearing. Counsel was there present. Witnesses, we assume, were segregated, or could have been. None of the evils surrounding ex parte showups and lineups can be attributed to that proceeding for the benefit of the defendant.

REVERSED AND REMANDED FOR NEW TRIAL.

SMITH, J., not participating.

BOSLAUGH, J., dissenting.

The identification testimony offered by the State in this case was not as satisfactory as it might have been. The opportunity of the victims to observe the offender was limited by the way in which the crimes were committed. If the exclusionary rules are applied too strictly in such cases, it becomes impossible to prosecute for offenses committed in such a manner.

At the time of the offense, January 22, 1972, the witness Patricia saw the profile of the offender at close

range and heard his voice. Following a hearing in another case on February 8, 1972, she failed to identify the defendant. At the preliminary hearing on March 1 and 2, 1972, she said the defendant "fit the description of exact-y (exactly) what I saw." She had an opportunity to hear the defendant's voice at that hearing and advised the prosecutor on January 23, 1973, that she could make a positive identification. She heard the defendant's voice again at the hearing on January 24, 1973, and made a positive identification at the trial based largely on profile and voice.

Her testimony was weakened by the failure to identify the defendant at the February 8, 1972, hearing and by some prior statements which were subject to interpretation. These matters were all before the jury, and in my opinion were questions to be decided by the jury. I would affirm the judgment of the trial court.

SPENCER, J., concurs in this dissent.