STATE OF NEBRASKA, APPELLEE, V. JOSEPH SANCHELL, APPELLANT.

220 N. W. 2d 562

Filed July 25, 1974. No. 39042.

Paul E. Watts, J. Joseph McQuillan, Bill Campbell, Gerald E. Moran, and George R. Sornberger, for appellant.

Clarence A. H. Meyer, Attorney General, and Chauncey C. Sheldon, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

WHITE, C. J.

This case reaches us a second time on reargument after we granted a motion for rehearing. Our first opinion in this case is reported in State v. Sanchell, 191 Neb. 505, 216 N. W. 2d 504. In that opinion we reversed

the judgment and remanded the cause for a new trial solely on the ground that the identification of the defendant by the witness Patricia, one of the identification witnesses, was a product of a tainted showup with no independent basis; and, therefore, should have been excluded. On reargument, we affirm the conviction and set aside that part of our previous opinion holding that the admission of the witness Patricia's identification testimony was error.

The facts of this case may be found in our previous opinion, State v. Sanchell, *supra.* The sole issue presented before us on reargument is whether the witness Patricia in making an in-court identification of the defendant did so as a result of a taint; and if so, was there an independent basis for the identification?

As the State concedes in its brief the showup of February 8, 1972, was "unnecessary" and possibly "impermissible." However, the admission of evidence of a tainted showup does not without more violate due process. Neil v. Biggers, 409 U. S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401; Stovall v. Denno, 388 U. S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199. The entire purpose of excluding such evidence made as a result of a tainted identification procedure is to avoid "* * * a substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U. S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247. Each case must be determined on its particular facts. In order to find a due process violation, the court must determine if the independent basis of the identification when viewed "in the totality of the circumstances" defeats a "substantial likelihood of irreparable misidentification." We find no error in the District Court's decision of admissibility at the suppression hearing.

We stated in State v. Cannon, 185 Neb. 149, 174 N. W. 2d 181, citing United States v. Broadhead, 413 F. 2d 1351 (7th Cir., 1969): "* * * the court held that

in-court identification evidence was admissible where such identification was made on a basis independent of a tainted line-up. This case also sets out the general procedure for determination of such questions by the trial court in the following words: 'Where the prosecution intends to offer only an in-court indentification, the defense may challenge its admissibility. The court should then, on facts elicited outside the presence of the jury, rule upon whether a pre-trial identification by the same eyewitness is violative of due process or the right to counsel. If a violation is found, the court should then decide whether the in-court identification is still admissible because it has an independant (sic) source; indeed, it would appear in the interest of expeditious judicial administration for such a ruling to be made in any event. If the judge regards only the in-court identification as admissible, in the trial to the jury thereafter, the defense may, as a matter of trial tactics, decide to bring out the pre-trial confrontation itself, hoping that it can thus detract from the weight the jury might otherwise accord the in-court identification.' " The District Court either decided at the suppression hearing that there was no taint flowing from the showup or that there was an independent basis.

In the instant case, witness Patricia did not make an identification at the showup on February 8, 1972, nor did she do so immediately afterwards. She did not make an identification at the showup even though Patricia knew that she and several other girls were in court "* * * to identify somebody." Witness Patricia identified the defendant for the first time on January 24, 1973, at the suppression hearing. She identified the defendant based partly on his profile and hands that she saw clearly for the first time after the robbery at the preliminary hearing on March 1 and March 2, 1972. More importantly, however, she heard him speak for the first time at the preliminary hearing. She stated

that the voice was the same as the voice she heard in her room on January 22, 1972. She made the positive identification only after she was sure the defendant was the same man. While it cannot be determined how much effect the showup had on Patricia, there is no doubt that the basis of her identification, the profile, the hands, and the voice was totally independent of the showup. At the showup, she did not notice anything. The defendant had his back to her and there is nothing in the record to indicate that she heard the defendant speak.

Thus, the three factors that Patricia used to identify the defendant were not affected as a result of the tainted showup. Furthermore, the basis of the identification, even if the taint had some effect on Patricia, was totally independent of the taint. The voice identification had absolutely no connection with the visual showup of February 8, 1972.

In all the identification cases, an indentification has been made directly as a result of a "impermissibly suggestive," "tainted," or "illegal" identification procedure. United States v. Wade, 388 U. S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (post-indictment line-up without counsel); Gilbert v. California, 388 U. S. 263, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (post-indictment line-up without counsel); Stovall v. Denno, *supra* (showup without counsel); Simmons v. United States, *supra* (pre-indictment photographic array); Neil v. Biggers, *supra* (a station house showup without counsel). That is not the case in the present situation. The identification was made over a period of time as a result of memory and recollection. The showup occurred prior to the filing of the information.

It must be said that some, if not all, of the difficulty in our determination of admissibility arose from a detailed, searching, and very able cross-examination of Patricia. A close reading of this cross-examination

reveals that this young witness became uncertain and perhaps confused at certain times in responding to the precise questions propounded to her. This, of course, is a rather typical picture of an able and experienced defense counsel examining a young and inexperienced lay witness. In any event we do not pass on the credibility or the weight of Patricia's testimony. The question here is the sufficiency of her testimony to support its admissibility. The impact and effect of her testimony during cross-examination is for the jury. It is clear however that throughout her testimony, she never waivered from her basis for identification. Patricia was only one of three witnesses identifying the defendant. It is true that she could not positively identify the defendant until a year and one day after the crime. As to the voice identification it is argued that another witness sitting next to Patricia at the preliminary hearing when she first heard the defendant's voice only heard a "mumble." It is also true that Patricia was only able to see the intruder's face for 3 seconds. There was a question as to whether there was sufficient "daylight" available for her to observe the defendant in the 3-second period of time. But, whatever the source, she did testify that there was sufficient light available for her to observe the defendant's face for this period of time. But more importantly, Patricia did not identify the defendant at the showup or at any other time on the basis of visual face identification. Her positive identification was based, by her own testimony, upon the independent voice recognition. The trial court could have found that there was no impermissible suggestiveness or taint arising from the showup on February 8, 1972, because *Patricia did not identify the defendant at that time.* We cannot say as a matter of law, that there was some momentum of impermissible suggestiveness or taint that was initiated and put into motion at the time of the February 8, 1972, showup. Her failure

to identify at that time, of course, may be used and was used for the purpose of impeaching her identification testimony. These questions, of course, are all for the jury. The credibility of the witnesses and the weight of the testimony are questions for the jury to decide. State v. Meyers, 182 Neb. 117, 153 N. W. 2d 360; State v. Sukovaty, 178 Neb. 779, 135 N. W. 2d 467; State v. Abraham, 189 Neb. 728, 205 N. W. 2d 342. It was the jury's duty to weigh these factors in determining how much weight, if any, it should place on Patricia's testimony.

Since there was an independent basis, was the means of identification sufficient to support a conviction? We have held that a voice identification, without more, is enough to support a conviction. Froding v. State, 125 Neb. 322, 250 N. W. 91; Small v. State, 165 Neb. 381, 85 N. W. 2d 712. In the present case, not only is there a voice identification, but such is also accompanied by the profile and hand characteristics of the defendant. Where the defendant is identified by a witness with the above physical features, the probative value of such is solely a question for the jury. Froding v. State, *supra.*

We adhere to our former opinion and decision except for that portion holding the testimony of Patricia inadmissible. On reargument we hold it admissible and affirm the judgment and sentence of the District Court.

AFFIRMED.

CLINTON, J., dissenting. McCOWN, J., joining.

I dissent for the reasons stated in the original opinion of this court found in State v. Sanchell, 191 Neb. 505, 216 N. W. 2d 504, but I desire to amplify the matters there set forth even though at the risk of some repetition. For a complete statement of the case and of the applicable rule of law, which the present opinion does not disavow, see the original opinion.

That rule, which this court now in practice rejects, is not a technical exclusionary rule such as that in-

volved in Mapp v. Ohio, 367 U. S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, 84 A. L. R. 2d 933, imposed as a sanction to restrain supposed unconstitutional police activity and having nothing to do with the probative value of evidence and the wisdom and effectiveness of which is dubious. The rule which we apply in this case relates to the reliability of evidence and consequently goes directly to the issue of the innocence or guilt of the person charged and involves constitutional due process.

The proof here depends solely upon eyewitness identification where the opportunities for observation were difficult and severely limited, and where there was no circumstantial evidence whatever supporting a finding of guilt. In putting the matter in proper perspective, the following observations, in a text written by an experienced trial judge, are pertinent. "Trials are held many months after the initial pretrial corporeal or photographic confrontation. When the victim (or other identifying witness) takes the stand and, pointing to the defendant seated conspicuously at the counsel table, says 'that's the man!' he rarely is saying 'that's the man who robbed me several months ago.' In truth, most often he is saying: (1) that's the man whose photo I identified shortly after the crime; (2) whom later I identified at a lineup; (3) whom later I identified at the preliminary examination; (4) whom later I identified by 'mug shot' before the grand jury; (5) whom later I saw in the courtroom during several adjournments of the trial.

"If the *initial* identification, whether corporeal or photo, was accurate, then the right man is on trial.

"If the initial identification was, however, mistaken or uncertain, then an innocent man is on trial. The initial mistake will inevitably be carried through all future identifications. Rarely if ever will the witness who was positive at the initial identification, or who

has become positive by virtue of suggestion, express any doubt in the several later judicial proceedings, including the trial. This the Wade Court observed was the 'common experience!'

"There are indicia of 'danger' which unhappily only the truly experienced trial judge will recognize. .

. "The prime concern must necessarily be with the 'pure' identification cases, those in which there is no evidence other than eye-witness identification to establish guilt." Eye-witness Identification, Legal and Practical Problems, Sobel, § 3.01, pp. 10, 11. The above are express truths which almost every person knows from his own experience in harmless but perhaps embarrassing encounters where one has been the subject of or has made a mistaken identification.

: The present opinion does not abrogate the rule of law followed in the original opinion in this case, but purports to find that Patricia's positive identification has a source "independent" of the tainted one man showup in that it is based upon her observations at the time of the crime. We therefore direct our attention to this assertion even though it requires repetition of matters covered in the original opinion.

The court now asserts that the identification by Patricia is independent of the illegal and tainted showup because: (1) She saw the actor's profile at the time of crime; (2) she recognized his hands; and (3) she recognized his voice.

The precise question asked of Patricia demonstrates that her identification was not based upon her observations at the time of the event. On point (1), we now quote from the original opinion and portion of the record included in the quotation: "Patricia testified on direct examination at the suppression hearing that she did not know why she was there on February 8. She made no identification of the defendant as the perpetrator immediately thereafter. The night before the suppres-

sion hearing on January 24, 1973, 1 year and 1 day after the crime, she first advised the prosecutor that she would make a positive identification. At the suppression hearing she testified on cross-examination: 'I told him last night that I was going to identify him today.' On direct examination she had answered the following leading question in the affirmative: 'Now, . . ., from the observation which you made in your room of this particular individual *and observations which you made in the County Courtroom at the preliminary hearing* in this matter and from hearing the defendant speak here in the courthouse today do you have an opinion as to whether or not the person that was in your room on the early morning of January 22nd, 1972, is here in the courtroom today?' She then identified the defendant as the man. On cross-examination she admitted that at the preliminary hearing she testified that he 'fits the description.' *She testified that she had never heard his voice until the suppression hearing.* It was the *night before* the suppression hearing that she decided she would testify positively that the defendant was the robber. She admitted that at the preliminary hearing she could not identify him because she had not seen his whole features at the time of the crime. She also acknowledged that she had told a police officer she 'could not identify the person that robbed [her]'." (Emphasis supplied.) State v. Sanchell, *supra.*

Note, she did not identify the defendant as the man at the preliminary hearing, yet her trial identification was based upon her observations at that time. Her observations at the time of the crime were limited to 3 seconds in a dark room. She saw a black face 2 to 6 inches from hers, necessarily out of focus. For 1 year and 1 day she could not make her identification. She could not give a description to the police sufficient to make a composite drawing. This was done wholly from Renee's description. She could not identify de-

fendant's photograph. She did not even pick his photograph out as bearing a resemblance to the robber. She could not identify him at the one man showup. She could not identify him at the preliminary hearing. Yet 1 year and 1 day after the event and immediately prior to the suppression hearing, without any explanation or reason, she agreed in a conference with the prosecutor to make a positive identification.

On point (2), the record clearly demonstrates on pages 200 to 215 of the bill of exceptions that never at any time had Patricia claimed that she "saw" the thief's hands. The testimony found on those pages of the record referred to conclusively demonstrate that she did not. She acknowledged that at the preliminary hearing she had testified (referring to the thief's hands): "I had just concluded that they would be long and lanky." Yet this supposed identification of hands is a key factor in the court's determination that the basis of identification was independent of suggestion.

On point (3), the identification by voice, at no time during the 1 year that elapsed between the crime and the suppression hearing did Patricia make any assertion that she could recognize the perpetrator's voice. The night before the suppression hearing she agreed to make a positive identification without ever having heard the defendant speak in the interim, neither at the showup, nor at the preliminary hearing. If she made any such claim, would not a lineup designed for the sole purpose of voice identification have been appropriate?

It seems clear beyond question that the identification made by Patricia was not based upon her observations at the time of the event. The finding of independent source by the trial judge cannot be sustained on the record and neither can the present opinion of this court.

The text writer earlier quoted summarizes as follows: "An in-court identification has an independent source

when the suppression hearing judge can find on the basis of the factors discussed, that the identifying witness by drawing on his memory of the events of the crime and his observations of the defendant during the crime, has retained such a definite image of the defendant that he is now able, in court, to make an identification of the defendant without dependence upon or assistance from the tainted pretrial confrontation and unaffected by any observations, prompting or suggestions which there took place." Eye-Witness Identification, Legal and Practical Problems, Sobel § 68, p. 122.

The present opinion states: "A close reading of this cross-examination reveals that this young witness became uncertain and perhaps confused at certain times in responding to the precise questions propounded to her. This, of course, is a rather typical picture of an able and experienced defense counsel examining a young and inexperienced lay witness." This statement can, in the light of the record, be correctly, but uncharitably, characterized as inaccurate. There was no unfair advantage taken at all. She was simply confronted with her prior contradictory statements and failure to identify. These she reluctantly and evasively acknowledged.

It cannot be said that the admission of Patricia's identification is harmless error, because the identification by Renee (the only evidence sufficient to support a conviction) is shaky and subject to grave doubt. We illustrate the point by the following from the record. Officer Jacobson, in his report (he gave essentially the same testimony in his cross-examination), states: "She [referring to Renee] had of course told me in the polygraph examination that she could not identify him." At that time she also told him "none of the girls could identify him." Renee said "perhaps she could recognize [his] voice." In one of the officer's comments

regarding a question he had asked the defendant during his polygraph examination as to whether the defendant had ever seen Renee before the hearing and to which he received a negative response, he remarked *"however, if the room was as dark as the girl had said,* possibly he maybe hadn't seen the girl in his own mind." (Emphasis supplied.) (Note the assumption of guilt by the officer—despite the fact there was yet no evidence to connect the defendant.)

This seems to be a case in which a great many minds have changed from time to time. (1) The polygraph operator, for reasons extrinsic to the crime here involved, backed away from his original statement to defense counsel that the defendant had passed the polygraph test. (2) The prosecutors, who were so doubtful after the preliminary hearing that they had the right man that they agreed to dismiss if the defendant did pass the polygraph examination, later backed away from that agreement. (3) Patricia, 1 year and 1 day after the event, changed her mind and decided that after all she could positively identify the thief. (4) Two judges of this court have changed their minds on the question of whether the record establishes an independent source for Patricia's identification of the defendant.

One wonders about this uncommon coincidence of events. This is an age of much lawlessness and that is of great concern to all, especially to the victims, the courts, and those engaged in law enforcement. We must not, however, allow our reactions to this scourge to affect our judgment to the extent that in the methods we use and the principles we apply we lose sight of the ultimate question of innocence or guilt. It does not do to convict just anyone. It does not do to follow methods and principles which may as readily convict the innocent as the guilty.

The defendant may be guilty; he may be innocent.

But the record makes one thing clear: Patricia is not able, on the basis of her observations and recollections at the time of the crime, or those presented by an accurate initial identification, to point out the perpetrator. Her identification was clearly the result of impermissible suggestion. She ought not be permitted to make the identification. I would adhere to the original opinion and remand the cause for a new trial.