STATE OF NEBRASKA, APPELLEE, v. FREDERICK D. BANKS, III, APPELLANT.

237 N. W. 2d 875

Filed January 29, 1976. No. 40181.

Warren S. Zweiback of Zweiback & Laughlin, for appellant.

Paul L. Douglas, Attorney General, and Chauncey C. Sheldon, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

CLINTON, J.

The defendant, Frederick D. Banks, III, was found guilty by a jury on charges of robbery and the use of a

firearm in the commission of a felony. He was sentenced to confinement in the Nebraska Penal and Correctional Complex for a term of 5 to 10 years on the robbery charge and to a consecutive term of 3 years on the firearm charge. He appeals to this court and assigns as error the following: (1) The trial judge erred in not suppressing an in-court identification which he alleges was the product of an impermissibly suggestive lineup. (2) The trial judge erred in admitting testimony at trial of an identifying witness that she had previously identified the defendant in a lineup. (3) The trial judge erred in admitting testimony as to a quantity of currency found on the defendant's person at the time of his arrest 4 days after the robbery. (4) The sentences imposed are excessive because the defendant has no serious prior criminal record. We affirm.

The last comprehensive review by this court of the rules of law applicable to the first two assignments of error was in our opinion in State v. Sanchell, 191 Neb. 505, 216 N. W. 2d 504. Upon rehearing in that case a majority of this court reached different factual conclusions, but the legal principles applicable were not affected. In the opinion cited above we reviewed the various opinions of the Supreme Court of the United States relating to the issue and then stated the rules as follows: "The conduct by the police, at whatever time, of identification procedures must not be so unnecessarily suggestive and conducive to a substantial likelihood of irreparable mistaken identification as to be a denial of due process of law.

"Whether an idenfitication procedure is violative of due process will be determined upon a consideration of the totality of the circumstances surrounding it.

"Even though an identification procedure may have been suggestive, the in-court identification may be allowed to go to the jury if under the totality of the circumstances it is determined to be reliable because it has an origin independent of the taint.

"If identification procedures are such as to violate due process, the denial of a proper and timely motion to suppress and the admission of the in-court identification constitutes reversible error unless this court can say beyond a reasonable doubt that the error was harmless." In that opinion we also, with reference to the bolstering of the in-court identification by testimony of the previous identification by the witness at a lineup, pointed out that such bolstering is prohibited only where the lineup or other pretrial identification violates due process standards. We there also noted our view that the per se exclusionary rule of Gilbert v. California, 388 U. S. 263, 87 S. Ct. 1951, 18 L. Ed. 2d 1178, had implicitly been overruled by Neil v. Biggers, 409 U. S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401.

In the present case the first question we must decide is whether, under the totality of the circumstances shown by the record, the pretrial identification procedures were so unnecessarily suggestive as to be conducive to a substantial likelihood of irreparable misidentification. If that question is answered affirmatively, the in-court identification is nonetheless admissible if it is determined in the light of all the evidence that the identification was reliable because it has an origin independent of any taint from suggestive pretrial identification procedures.

As we read the brief of the defendant, his first two assignments are directed to the identification testimony of the witness Itaras Rose.

Two front desk employees at the Holiday Inn at 72nd and Grover Streets in Omaha were robbed at gunpoint by two black men at about 2:15 o'clock a.m. on November 16, 1974. Approximately $2,300 in currency, property of the Inn, was taken in the robbery. The only witnesses were Patricia Thomas, desk clerk, Itaras Rose, night auditor, and Gene Petro, a guest of the Inn. The conviction of the defendant rested upon his identification by the witnesses Rose and Petro. These wit-

nesses testified that the defendant was the shorter of the two robbers, was the one armed with a revolver, and was the one who gave directions during the robbery.

Details of the robbery are important to the issues here to be decided only insofar as they relate to the certainty of the identification by these witnesses and their opportunities for observation. We therefore make detailed reference to the evidence from the Wade hearing and the trial only as we discuss the testimony of these witnesses and the manner in which the pretrial identifications were made.

After the robbers left the Inn, the police were called. Petro and Rose gave descriptions to the police. Thomas could not. The substance of the latter's testimony at trial was that the robbers were two black males, one tall and one shorter. The shorter one held the gun and gave the directions. She could not otherwise describe the robbers other than: "I really don't remember. The only thing that I was interested in was the gun. All I know is the one was tall, and I thought sure that he had a black jacket on, leather one. And the short one, I don't remember anything, except the gun. That's all I could remember. Q. Just the gun? A. Yes, sir, and that he was short." This witness did not identify the defendant at trial nor in a lineup.

Shortly after the robbery one of the investigating officers took the three witnesses to the police station where the witnesses looked at photographs in mug books. At that time Rose picked out a photo of one Willie Haney as one bearing a resemblance to the shorter robber. Haney was apprehended later that day and the police conducted a showup with Haney alone at which Rose and Thomas were present. Rose then stated positively that Haney was not the robber. Thomas also did not believe he was the one.

On November 20, 1974, Petro was a guest at the Hilton Hotel in Omaha and at about 11:15 p.m. on that date

he entered the lobby from the elevator. As he did so a young black man moved toward the elevator to enter it. Petro immediately recognized the face as one he had seen before and as the two men passed Petro realized it was the man who held the gun during the robbery at the Holiday Inn on the 16th. Petro also at the time recognized a leather jacket worn by the man as one identical to one worn by the robber. Petro immediately notified the hotel security officer (an off-duty policeman) and the police were called. The defendant was apprehended about an hour and a half later after he was seen leaving the elevator and going to the parking garage adjacent to the Hilton Hotel.

Later, on the night of November 20, 1974, at the jail, a lineup was held. The lineup consisted of the defendant (minus jacket); two black city employees then working at the jail; and a black jail inmate, one Terry Kent. One of the employees in the lineup was about 6 feet 4 inches tall. The other three, including the defendant, were about the same height, but the second employee was considerably heavier and wore a full beard. Both the defendant and Kent then had thin mustaches and they would appear from lineup photographs to be of about the same age although Kent was stated to be 16 years of age and the defendant about 25. The defendant was attired in a brown turtleneck sweater and brown slacks. The two employees wore blue slacks and denim work jackets. Kent was attired in blue trousers, a loose blue undershirt, and a faded denim jacket. At this lineup Thomas stated that Kent looked most like the smaller of the two robbers. Rose was then called to view the lineup. She at once identified the defendant as the man who held the gun and gave directions during the robbery. Petro was then called and he identified the defendant.

At trial Rose identified defendant as the robber who held the gun and did the talking. She stated that his appearance was distinctive because of his thin nose and

face. She at trial further testified to her identification of the defendant at the lineup on November 20, 1974, and testified that she had at that time stated: " 'I'm positive that's him.' " At trial Petro positively identified the defendant. He was not a witness at the Wade hearing and was not asked at trial to buttress his identification by testimony of his previous lineup identification.

It is clear that Petro's identification of the defendant was not dependent upon his identification of him at the lineup. Prior to the lineup he had spontaneously identified the defendant as the latter was boarding the elevator at the Hilton Hotel. This spontaneous identification by Petro is very like the identification to which we attached considerable weight in State v. Moss, 187 Neb. 391, 191 N. W. 2d 543. The description Petro gave the police immediately after the robbery was in no way inconsistent with his later identification and testimony. At the trial Petro testified that he had good looks at the defendant's features on four occasions just before and during the robbery, viz., (1) when he and the robber looked directly at each other when the robber was at the telephone; (2) when the revolver was jabbed in his ribs or stomach; (3) when the robber opened the door and directed him to go into the room where Rose was working; and (4) again when Petro was moving to lie down on the floor at the robber's direction.

We find that the lineup was not unduly suggestive. The only black persons immediately available were the three who stood in the lineup with the defendant. At least one of these was sufficiently close in general appearance to the defendant so that the witness Thomas thought he resembled the robber. We further find that the identification by Rose and Petro rested upon an independent basis free of any possible taint by the lineup.

We now consider the third assignment. At the police station following his arrest defendant was found to have in his possession $753 in currency, including the

following: Four $100 bills, two of which were new and two of which were old, the new bills bearing consecutive serial numbers; and ten $5 bills, eight of which were new. The serial numbers of these new bills were every second number in consecutive order of two different series, tending to support the conclusion that the series could have been recently split between two or more persons. During the State's case-in-chief one of the police officers was, over the defendant's objection, permitted to testify to the possession of this money by the defendant at the time of his arrest. The record establishes that none of the $2,300 currency taken consisted of $100 bills. The defendant therefore argues that the money could not have come from the robbery and was therefore irrelevant. The State's theory is that, since there is other evidence to connect the defendant with the crime, the possession of this substantial sum of money shortly after the crime has some relevance, and that the newness of some of the bills and the unusual relation of serial numbers tend to support an inference that money taken in the robbery had been exchanged for the purpose of disguising it.

The general rule is that in a prosecution for a crime, where there is other evidence of the guilt of the accused and the crime is of such a nature that the acquisition of money may be regarded as a natural or ordinary result of its perpetration, evidence is admissible of the sudden acquisition of money by the defendant, or the marked improvement in his financial condition at or subsequent to the time the offense was committed, even though the source of the money is not definitely traced or identified by the prosecution. 91 A. L. R. 2d 1049. In this case the State's case-in-chief did not introduce any evidence to show the defendant's financial circumstances previous to the robbery. However, the defendant took the stand in his own behalf, denied his participation in the robbery, and testified to an alibi which was weakly corroborated. His testimony further

showed that he was by trade a drywall taper and earned about $8 per hour; and that in this trade one was not usually employed fulltime and that, in this particular case, he had not been regularly employed since August of 1974.

Some courts have admitted proof of possession of substantial sums of money in cases similar to this even where the financial condition of the defendant previous to the crime has not been shown and they have said that in all such cases the weight of such evidence is for the jury. See, Harrison v. State (Fla. App.), 104 S. 2d 391; People v. Siemsen, 153 Cal. 387, 95 P. 863; People v. Falls, 150 Cal. App. 2d 554, 310 P. 2d 484; People v. Gardner, 128 Cal. App. 2d 1, 274 P. 2d 908; State v. Cofer, 73 Idaho 181, 249 P. 2d 197. We hold that under the circumstances here shown, the testimony as to the possession of the currency by the accused was not erroneous.

The last assignment of error is the claim of excessive sentence. The defendant had no prior felony conviction. However, the evidence establishes a threat to the lives of the victims and a claim of professionalism by the robber. Petro testified that the defendant said to Rose: " 'Lady, you better get down on the floor or I'll blow your head off. I do this for a living. I'm not fooling around. I do this for a living.' " The other two witnesses testified similarly. We do not feel that the sentence imposed was, under the circumstances, excessive.

AFFIRMED.