#26752-a-LSW

**2014 S.D. 33**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

DOAP DENG CHUOL,                          Defendant and Appellant.


* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE PATRICIA C. RIEPEL
Judge

* * * *

MARTY J. JACKLEY
Attorney General

BETHANY L. ERICKSON
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
                                          and appellee.


MOLLY C. QUINN of
Office of the Minnehaha
 County Public Defender
Sioux Falls, South Dakota                 Attorneys for defendant
                                          and appellant.

* * * *

CONSIDERED ON BRIEFS
ON MARCH 24, 2014

OPINION FILED **06/18/14**

#26752

WILBUR, Justice

[¶1.]        A jury found Doap Deng Chuol guilty of three counts of distribution of

a controlled drug or substance in violation of SDCL 22-42-2 and three counts of

possession of a controlled drug or substance in violation of SDCL 22-42-5.  Chuol

appeals a number of issues, including the circuit court's denial of his motion to

suppress the in-court identification, the refusal of his proposed jury instruction

regarding cross-racial identification, and the denial of his motion for judgment of

acquittal.  We affirm.

### FACTS AND PROCEDURAL BACKGROUND

[¶2.]        L.S. started working with the Sioux Falls Police Department as a

confidential informant in January or February of 2009, primarily working with

Detective Thomas Schmitz.  L.S. had performed "controlled buys"[1] more than 50

times while working with narcotics detectives.

[¶3.]        In early 2011, L.S. approached Detective Schmitz and informed the

detective that she knew someone who sold crack cocaine.  L.S. only knew the seller

by his nickname, "D."[2]

---

1.      A controlled buy occurs when a confidential informant, under the direction of
        law enforcement, arranges to purchase an illicit drug from a suspected drug
        seller.  Prior to the buy, law enforcement officers search the confidential
        informant and fit him or her with a recording and monitoring device.
        Members of law enforcement, who participate in the controlled buy, maintain
        audio and visual surveillance of the confidential informant during the
        transaction.  The confidential informant is provided marked bills to purchase
        the drugs.  After the transaction occurs, the confidential informant is once
        again searched and he or she surrenders the drugs to law enforcement.

2.      L.S. testified that it was not unusual for an individual involved in the drug
        community to be known exclusively by a nickname.

-1-

[¶4.]     L.S. met D through another drug dealer known by the moniker, "B.K." B.K. told L.S. that she should contact D to purchase crack cocaine if L.S. could not reach B.K. for a sale. L.S. received D's phone number from B.K.

[¶5.]     At the motion to suppress hearing, L.S. testified that after meeting D, she gave D a ride to D's apartment at 808 West Bailey Street. She stated that the car ride lasted five to ten minutes.[3]

[¶6.]     L.S. and Detective Schmitz arranged three controlled buys from D. The first controlled buy occurred in the afternoon on March 22, 2011. During this buy, L.S. met D in a stairwell in the apartment building at 808 West Bailey Street. D stood four or five steps above L.S. during the transaction, which involved D handing L.S. the drugs and L.S. paying for the drugs with the marked bills provided to her by Detective Schmitz. After the transaction, L.S. gave Detective Schmitz a small baggie of drugs[4] and informed him that she had purchased the drugs from D. L.S. described D as a black male, about 20 years old, with "buck" teeth. She noted that his clothing consisted of dark pants, a thermal shirt or t-shirt, and either a

---

3.     L.S. also testified at the motion hearing that she provided D with a second car ride during this time frame. The circuit court, however, did not include this second car ride in its findings of fact. At the motion hearing, L.S. testified:

> **A.** I gave him a ride two different times. The one at Super 8 and once was another individual.
>
> **Q.** Okay. So before the first buy you gave him a ride on two occasions?
>
> **A.** I believe it was two. Maybe there was another one. It's been awhile.

4.     Tests later confirmed that the substance L.S. purchased in each of the three controlled buys was crack cocaine.

black beanie hat or "doo-rag." When asked by detectives whether D was tall and skinny, L.S. responded "No, not tall. Shorter. About my height." L.S. testified that she is five foot eight inches tall. The March 22, 2011 purchase was not observed by detectives nor was it video recorded.

[¶7.]     At the motion hearing, L.S. testified that after the first controlled buy, but prior to the second controlled buy, she spent five to ten minutes with D at B.K.'s apartment. L.S. testified that also during this time, she gave D a ride from an apartment in central Sioux Falls to D's apartment at 808 West Bailey Street. She testified that she spent five to ten minutes in the vehicle with D.

[¶8.]     L.S. and detectives conducted a second controlled buy from D in the afternoon of May 4, 2011. The buy took place at 808 West Bailey Street, the same location that the first controlled buy had taken place. Prior to the second buy, L.S. was searched, fitted with a recording device, and provided marked bills. Once she arrived at 808 West Bailey Street, L.S. followed D across the street from the apartment building. Once across the street, D, who was driving a dark blue car,[5] got out of his car and into L.S.'s car, where the transaction took place. This controlled buy lasted a few minutes.

[¶9.]     Detective Ryan Qualseth conducted surveillance at 808 West Bailey Street before, during, and after the second controlled buy. Prior to the controlled buy, he observed a blue Lincoln Town Car enter the parking lot. Two black males exited the Town Car and entered the apartment building. Detective Qualseth then

---

5.    L.S. testified that she recognized the dark blue car as the same vehicle that she saw D drive on previous occasions.

observed the driver of the blue Town Car exit the apartment building and approach L.S.'s car. The driver then got into the blue Town Car and exited the parking lot with L.S. following him in her car. After the buy was completed, the blue car returned to the apartment building parking lot and the driver exited the car. Detective Qualseth was able to photograph these events as well as the license plate of the blue Lincoln Town Car. The car was registered to Doap Deng Chuol and the address listed on the registration was 808 West Bailey Street, apartment number eight.

[¶10.] When the second controlled buy was completed, L.S. gave the drugs to Detective Schmitz and stated that she had purchased them from D. The detective then showed L.S. a photograph of Chuol and asked L.S. if she recognized the person in the photograph as D. L.S. responded that she was not sure if the person in the photograph was D. L.S. explained at the motion to suppress hearing that "I didn't want to say I was sure if there was a doubt." She also explained that D always wore a hat during the controlled buys and the man in the photograph was not wearing a hat.

[¶11.] The final controlled buy between L.S. and D occurred in the afternoon of May 26, 2011. Prior to the buy, L.S. was searched, fitted with a recording device, and provided marked bills. L.S. and D met at the same apartment building. When she arrived, L.S. called D and asked him to meet her at her car. D exited the rear door of the apartment building and went to the driver's side window of L.S.'s car. The transaction occurred through L.S.'s car window. Undercover detectives took surveillance photographs of the transaction.

[¶12.] Following this exchange, L.S. met with Detective Schmitz and gave him the drugs she purchased from D. L.S. told Detective Schmitz that D was wearing shorts, a shirt, and a hat, but she could not remember the specific colors. Also during this meeting, Detective Schmitz showed L.S. two photographs of Chuol and L.S. told Detective Schmitz that the individual in the photographs looked like D.

[¶13.] Chuol was charged by indictment with three counts of distribution of a controlled drug or substance, in violation of SDCL 22-42-2, and three counts of possession of a controlled drug or substance, in violation of SDCL 22-42-5. The State also filed a part II information, which was later amended to reflect an allegation that Chuol had been convicted of a prior felony and was a habitual offender under SDCL 22-7-7.

[¶14.] Chuol filed a motion to suppress evidence seeking to exclude L.S.'s identification of him as the suspect in a photo lineup and to exclude L.S.'s subsequent in-court identification. At the motion hearing, Chuol and the State both agreed that the photo lineup was improper. The hearing was confined to the issue of whether the State met its burden of proof that the in-court identification had an independent origin purging the suggestive taint of the improper photo lineup. Ultimately, the circuit court granted the motion as to the photo lineup and denied the motion as to the in-court identification.

[¶15.] A jury trial was held January 29 and 30, 2013. At trial, L.S. was permitted, in accordance with the circuit court's earlier ruling, to identify Chuol in open court. The circuit court also denied Chuol's proposed jury instruction on cross-

racial identification and noted that sufficient eyewitness instructions would be given to the jury. Lastly, the circuit court denied Chuol's motion for judgment of acquittal. The jury convicted Chuol of all of the charges.

[¶16.]     Chuol raises the following issues for our review:

> I.     Whether the circuit court's admission of an in-court identification stemming from an impermissibly suggestive photo lineup violated Chuol's due process rights.
>
> II.    Whether the circuit court erred in refusing Chuol's proposed jury instruction regarding cross-racial identification.
>
> III.   Whether the circuit court erred in denying Chuol's motion for judgment of acquittal.

**DECISION**

[¶17.]     **I.    Whether the circuit court's admission of an in-court identification stemming from an impermissibly suggestive photo lineup violated Chuol's due process rights.**

[¶18.]     Chuol argues that the circuit court's denial of his motion to suppress L.S.'s in-court identification violated his due process rights under the Fourteenth Amendment to the United States Constitution and article six, section two of the South Dakota Constitution. He asserts that the in-court identification was irreparably tainted by Detective Schmitz's presentation of the highly suggestive photo lineup. Additionally, Chuol asserts that this issue presents a question of law reviewed de novo. Conversely, the State argues that it was an evidentiary ruling to be reviewed under an abuse of discretion standard.[6]

---

6.     On a number of occasions, we have examined identification procedures as evidentiary matters under an abuse of discretion standard of review. *See State v. Loftus*, 1997 S.D. 131, ¶ 16, 573 N.W.2d 167, 171 (citing *State v.*

(continued . . . )

[¶19.]      We review the denial of Chuol's motion to suppress based on the alleged violation of a constitutionally protected right as a question of law by applying the de novo standard of review. *State v. Ludemann*, 2010 S.D. 9, ¶ 14, 778 N.W.2d 618, 622. Additionally, "[w]e review findings of fact under the clearly erroneous standard." *State v. Lamont*, 2001 S.D. 92, ¶ 12, 631 N.W.2d 603, 607. Here, the factual findings of the circuit court are not in dispute, and thus, "the application of a legal standard to those [undisputed] facts is a question of law reviewed de novo." *Id.*

[¶20.]      We examine photographic lineups and in-court identifications under a two-part analysis: "(1) Was the lineup impermissibly suggestive, and (2) if so, was the subsequent in-court identification tainted?" *State v. Abdo*, 518 N.W.2d 223, 225 (S.D. 1994). "[E]ven though the photographic lineup may be considered to be

---

(continued . . . )

> *Abdo*, 518 N.W.2d 223, 226 (S.D. 1994) (that "[t]he trial court will not be reversed unless an abuse of discretion is shown")); *Abdo*, 518 N.W.2d at 226 (citing *State v. Hanson*, 456 N.W.2d 135, 138 (S.D. 1990) (stating "[t]his trial court will not be reversed unless, based on the totality of the circumstances, this Court decides that the trial court abused its discretion")); *Hanson*, 456 N.W.2d at 138 (stating "[t]he evidentiary rulings of a circuit court [involving identification procedures] will be disturbed only if the court abused its discretion"). However, in these prior cases, the Court was presented with the issue only as an evidentiary matter and not as a matter of whether the defendant's due process rights were violated. Whether due process is violated by the circuit court's denial of a motion to suppress is a question of law necessitating a de novo standard of review. *State v. Ludemann*, 2010 S.D. 9, ¶ 14, 778 N.W.2d 618, 622 (stating that we "review[ ] the denial of a motion to suppress alleging a violation of a constitutionally protected right as a question of law by applying the de novo standard [of review]") (quoting *State v. Madsen*, 2009 S.D. 5, ¶ 11, 760 N.W.2d 370, 374). *See United States v. Gipson*, 383 F.3d 689, 698-99 (8th Cir. 2004) (reviewing de novo whether the defendant's due process rights were violated as a result of a suggestive pretrial identification procedure and subsequent in-court identification).

impermissibly suggestive, the in-court identification is admissible upon the [S]tate's showing, by clear and convincing proof, that the in-court identification had an independent origin, i.e. based upon observation of the suspect by the witness other than the photographs shown to the witness." *State v. Jaeb*, 442 N.W.2d 463, 465 (S.D. 1989) (quoting *State v. Iron Thunder*, 272 N.W.2d 299, 301 (S.D. 1978)).

[¶21.] Because the State and Chuol agreed at the motion hearing that the photo lineup was improper, our focus is on the second prong of this two-part analysis. Thus, we consider "'whether under the totality of the circumstances[,] the identification was reliable even though the confrontation procedure was suggestive.'" *Id.* at 465-66 (quoting *State v. Phinney*, 348 N.W.2d 466, 468 (S.D. 1984)). "'Reliability of eyewitness identification is the linchpin' of [this] evaluation[.]" *Perry v. New Hampshire*, ___ U.S. ___, 132 S. Ct. 716, 724-25, 181 L. Ed. 2d 694 (2012) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253, 53 L. Ed. 2d 140 (1977)).

[¶22.] The reliability of eyewitness identification is determined by an examination of the following factors in light of the totality of the circumstances: "[t]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated [by the witness] at the confrontation, and the time between the crime and the confrontation." *Brathwaite*, 432 U.S. at 114, 97 S. Ct. at 2253. "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Id.* "Where the '[factors] of a witness' ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement

suggestion, the identification should be suppressed." *Perry*, ___ U.S. at ___, 132 S. Ct. at 725 (quoting *Brathwaite*, 432 U.S. at 114, 116, 97 S. Ct. at 2254). "Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury." *Id.*

*The opportunity of the witness to view the criminal at the time of the crime*

[¶23.]     L.S. had ample opportunity to view Chuol at the time of the crime. Two of L.S.'s three controlled buys from Chuol, while relatively quick transactions, took place outdoors in the daylight hours of the afternoon. Moreover, L.S. had interactions with Chuol before and in between the first and second controlled buys, when she provided him with rides to his home and when she spent time with him socially at B.K.'s apartment. During these instances, L.S. spent several minutes with Chuol.

*The witness's degree of attention*

[¶24.]     L.S. was involved in witnessing the three controlled buys because she was a confidential informant working for law enforcement. She was not a bystander or casual observer. In this role, she had a sufficient degree of attention as she was able to accurately describe details of Chuol's appearance and dress. She provided details of his physical characteristics, including distinct dental characteristics, as well as specific items of clothing that Chuol was wearing.

*The accuracy of the witness's prior description of the criminal*

[¶25.]     L.S.'s descriptions were sufficiently accurate. She was able to describe what type of clothing Chuol was wearing, his dark complexion, as well as his "buck teeth." L.S. provided specific color and clothing descriptions after the first

controlled buy. She also noted his habit of wearing a garment on his head, a "doo-rag" or beanie hat. While L.S. could not provide the colors of Chuol's clothing after the third controlled buy and she erred in her estimate of Chuol's height, these discrepancies go to the weight of the evidence and not to the sufficiency of her testimony to support its admissibility. *State v. Sanchell*, 220 N.W.2d 562, 565 (Neb. 1974) (stating "we do not pass on the credibility or the weight of [the witness's] testimony. The question here is the sufficiency of her testimony to support its admissibility. The impact and effect of her testimony during cross-examination is for the jury"); *State v. Sanders*, 733 N.W.2d 197, 208 (Neb. Ct. App. 2007) (stating "[d]iscrepancies and errors in identification where there is an adequate foundation are matters for a jury determination").

*The level of certainty demonstrated by the witness at the confrontation*

[¶26.] L.S. exhibited a great level of certainty in her in-court identification of Chuol. At trial, L.S. testified that she was "100 percent" certain that Chuol was the same person she had purchased drugs from during the three controlled buys. Additionally, after all three controlled buys, L.S. told detectives that she purchased the drugs from D. While L.S. could not positively identify Chuol from a photograph shown to her after the second controlled buy because Chuol always wore a hat during their encounters, she was able to provide a detailed physical description of Chuol to detectives after the first controlled buy.

*The length of time between the crime and the confrontation*

[¶27.] L.S.'s in-court identification at the jury trial was 20 months after L.S.'s last controlled buy from Chuol. However, despite this length of time, L.S. had

contact with Chuol prior to the first controlled buy, during the controlled buys, and during the time between the controlled buys. In addition, this Court has previously upheld an in-court identification that took place three years after the defendant's arrest. *See Abdo*, 518 N.W.2d at 226. Based on prior case law and the number of occasions L.S. spent with Chuol, 20 months was not an impermissible length of time between the crime and the confrontation.

[¶28.] Weighing all of the foregoing factors, we cannot say that the effect of the improper identification procedure outweighed L.S.'s ability to make an accurate identification. Accordingly, the circuit court's admission of the in-court identification did not violate Chuol's due process rights. The evidence was properly allowed to go to the jury.

[¶29.]     **II.     Whether the circuit court erred in refusing Chuol's proposed jury instruction regarding cross-racial identification.**

[¶30.] Chuol argues that the circuit court abused its discretion in refusing his proposed jury instruction regarding cross-racial identification. He contends that the proposed jury instruction would have informed the jury that it could, but was not required to, consider whether the fact that L.S. was white and Chuol was black affected the accuracy of L.S.'s eyewitness identification. Chuol's contention is that the refusal of this instruction affected the outcome of the case and prejudiced Chuol's right to a fair trial.

[¶31.]     "A trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard." *State v.*

*Hauge*, 2013 S.D. 26, ¶ 17, 829 N.W.2d 145, 150 (quoting *State v. Roach,* 2012 S.D. 91, ¶ 13, 825 N.W.2d 258, 263). "The jury instructions are to be considered as a whole, and if the instructions when so read correctly state the law and inform the jury, they are sufficient." *Id.* ¶ 17, 829 N.W.2d at 150-51 (quoting *Roach*, 2012 S.D. 91, ¶ 13, 825 N.W.2d at 263). "Error in declining to apply a proposed instruction is reversible only if it is prejudicial, and the defendant has the burden of proving any prejudice." *Id.* (quoting *State v. Janklow*, 2005 S.D. 25, ¶ 25, 693 N.W.2d 685, 695). "In order to show prejudice, the defendant must show that 'the jury would have returned a different verdict if the proposed jury instruction had been given.'" *Id.* (quoting *State v. Engesser*, 2003 S.D. 47, ¶ 43, 661 N.W.2d 739, 753).

[¶32.]        Here, as noted by the circuit court, L.S. had multiple visual contacts with Chuol in order to identify Chuol. Indeed, L.S. testified that she had given Chuol a ride to his apartment at 808 West Bailey Street prior to the first controlled buy and then another ride between that buy and the second buy. L.S. also testified that prior to the second controlled buy, she spent time with Chuol at B.K.'s apartment. L.S. had the opportunity to have visual contact with Chuol during the three controlled buys. In addition, the circuit court provided two eyewitness jury instructions that sufficiently informed the jury as to how to weigh eyewitness testimony.[7]

---

7.    Instruction 29 provides:

> The burden of proof is on the State to prove beyond a reasonable doubt, not only that the offenses were committed as alleged, but also that the defendant is the person who committed them. You must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict.

(continued . . .)

#26752

[¶33.] The cross-racial identification instruction that Chuol proposed was taken from a jury instruction recommendation from the American Bar Association's

_____

(continued . . . )

> The various factors you may take into consideration as to the accuracy of the identification of the defendant are:
>
> (1) the prior opportunity of the witness to observe the alleged criminal act;
>
> (2) the existence of any discrepancy between any prior description and the defendant's actual description;
>
> (3) any prior identification of another person;
>
> (4) the identification by picture of the defendant prior to the identification in question;
>
> (5) failure of the witness to identify the defendant on a prior occasion;
>
> (6) lapse of time between the alleged act and the identification;
>
> (7) any suggestive procedures in the pre-trial identification.
>
> This list is not intended to be exhaustive, but only includes some of the various factors which you may consider.
>
> If, from the circumstances of the identification, you have a reasonable doubt whether the defendant was the person who committed the offenses, you must give the defendant the benefit of that doubt and find the defendant not guilty.

Instruction 30 states:

> Witness [L.S.] has identified the defendant.
>
> As with any other witness, you must first decide whether the witness has testified honestly and truthfully. But you must do more than that.
>
> You must also decide whether the identification is accurate. In deciding those questions you should carefully consider all of the circumstances under which the witness made the observation of Doap Deng Chuol, and all of the circumstances under which the witness later identified the defendant as that person.

-13-

Criminal Justice Section.[8]  *See* A.B.A. Criminal Justice Section, *Report to the House of Delegates*, 104D (2008).  While other jurisdictions have required the use of an instruction on cross-racial identification,[9] we decline to do so under the facts of this case.  Based on the sufficiency of the instructions given, we affirm the circuit court's denial of Chuol's proposed jury instruction regarding cross-racial identification.

[¶34.]  **III.  Whether the circuit court erred in denying Chuol's motion for judgment of acquittal.**

[¶35.]  Chuol asserts that the circuit court erred in denying his motion for judgment of acquittal.  He contends that there was insufficient evidence that Chuol was the person who sold crack cocaine to L.S. on the dates alleged in the indictment.  Chuol argues that there was no evidence corroborating L.S.'s "tainted" identification of Chuol as the seller.

[¶36.]  We review the denial of a motion for judgment of acquittal de novo.  *Hauge*, 2013 S.D. 26, ¶ 12, 829 N.W.2d at 149.  We examine "whether the evidence

---

8.  Chuol proposed that the jury be instructed as follows:

> In this case, the identifying witness is of a different race than the defendant.  You may consider, if you think it is appropriate to do so, whether the fact that the defendant is of a different race than the witness has affected the accuracy of the witness' original perception or the accuracy of a later identification.  You should consider that in ordinary human experience, some people may have greater difficulty in accurately identifying members of a different race than they do in identifying members of their own race.
>
> You may also consider whether there are other factors present in this case which overcome any such difficulty of identification.

9.  *See, e.g., State v. Henderson,* 27 A.3d 872, 925-26 (N.J. 2011) (requiring trial courts to give a cross-racial identification instruction in every case where cross-racial identification is at issue).

was sufficient to sustain the conviction." *Id.* (quoting *Janklow*, 2005 S.D. 25, ¶ 16, 693 N.W.2d at 693). "Claims of insufficient evidence are viewed in the light most favorable to the verdict." *Id.* (quoting *State v. Morgan*, 2012 S.D. 87, ¶ 10, 824 N.W.2d 98, 100). "The question is whether there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt." *Id.* "We will not resolve conflicts in the evidence, assess the credibility of witnesses, or reevaluate the weight of the evidence." *Id.* "If the evidence, including circumstantial evidence and reasonable inferences drawn therefrom sustains a reasonable theory of guilt, a guilty verdict will not be set aside." *Id.*

[¶37.] The jury was presented with sufficient evidence to sustain Chuol's convictions. L.S. had visual contacts with Chuol prior to being shown any of the photo lineups by law enforcement. The jury assessed the credibility of L.S. and evaluated the weight of her testimony and evidence presented, including L.S.'s in-court identification of Chuol as the seller of the drugs. Both the discrepancy in L.S.'s testimony regarding Chuol's height and L.S.'s inability to identify Chuol by looking at a photograph of him after the second buy were presented to the jury. Ultimately, the jury determined that L.S.'s testimony was credible.

[¶38.] Further, L.S.'s eyewitness testimony alone is sufficient to support the guilty verdict because she viewed Chuol under circumstances that would permit a positive identification to be made. *State v. Mullins*, 260 N.W.2d 628, 630 (S.D. 1977) (holding that "[i]t is settled law that the credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the

accused under such circumstances as would permit positive identification to be made"). *See State v. Landa*, 642 N.W.2d 720, 725 (Minn. 2002) (stating that eyewitness testimony alone is sufficient to support a guilty verdict). Here, L.S. had multiple visual contacts with Chuol that each lasted several minutes. The record demonstrates that L.S. provided Chuol with rides to his apartment. She also testified that she spent time with Chuol at B.K.'s apartment. Additionally, L.S. was able to have visual contact with Chuol during all three controlled buys, which L.S. testified took place under conditions favorable to making a good visual identification.

[¶39.] In addition to L.S.'s testimony, the jury was also presented with additional testimony and evidence that is sufficient to support Chuol's guilty verdict. Detective Qualseth testified that he observed a blue Lincoln Town Car registered to Chuol enter the parking lot of 808 West Bailey Street on May 4, 2011. The driver and passenger exited the vehicle and entered the apartment building. Detective Qualseth saw the driver of the vehicle leave the apartment building and approach L.S., who was in her vehicle. The driver returned to his vehicle and then led L.S.'s vehicle out of the parking lot and across the street, where the second controlled buy took place. The jury was also presented photographs that Detective Qualseth took of the second and third controlled buys.

[¶40.] Based on L.S.'s in-court identification as well as the other evidence presented to the jury, there was sufficient evidence presented to support the jury verdict. Accordingly, the circuit court did not err in denying Chuol's motion for judgment of acquittal.

**CONCLUSION**

[¶41.]        The circuit court's admission of the in-court identification did not violate Chuol's due process rights.  The circuit court did not abuse its discretion in denying Chuol's proposed jury instruction regarding cross-racial identification.  Lastly, the circuit court did not err in denying Chuol's motion for judgment of acquittal.  We affirm.

[¶42.]        GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and SEVERSON, Justices, concur.