#29479-a-JMK
**2022 S.D. 17**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

ANTHONY O. RED CLOUD, II,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
LINCOLN COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE RACHEL R. RASMUSSEN
Judge

* * * *

KRISTI JONES of
Dakota Law Firm, Prof. LLC
Sioux Falls, South Dakota                    Attorneys for defendant and
                                             appellant.


JASON R. RAVNSBORG
Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota                         Attorneys for plaintiff and
                                             appellee.

* * * *

CONSIDERED ON BRIEFS
JANUARY 10, 2022
OPINION FILED **03/23/22**

#29479

KERN, Justice

[¶1.]     A jury convicted Anthony Red Cloud II (Red Cloud) of burglary and two counts of simple assault arising from a home invasion. Joe Zueger (Zueger) encountered Red Cloud shortly after he broke into Zueger's home. Red Cloud fled the home and was arrested later that morning on another charge. Zueger identified him as the intruder during a one-person show-up identification. Although Red Cloud moved to suppress this identification, the circuit court denied his motion and the evidence was received at trial. The State also introduced the results of DNA testing through expert testimony but inadvertently failed to send the expert's report to the jury for their deliberations. Red Cloud moved for a mistrial on this basis, which the circuit court denied.

[¶2.]     Red Cloud was charged and tried on a part II habitual offender information alleging two prior felony convictions. Red Cloud moved for judgment of acquittal following the State's case-in-chief on the basis that the State failed to prove that Red Cloud had been released from supervision for the prior felonies within the past 15 years. The circuit court denied this motion, and the jury found Red Cloud to be a habitual offender. Red Cloud appeals the circuit court's denial of his motion to suppress the show-up identification, his motion for a mistrial because of the omission of the DNA exhibit from jury deliberations, and his motion for judgment of acquittal in the habitual offender trial. We affirm.

**Factual and Procedural Background**

[¶3.]     Sometime shortly prior to 5:00 a.m. on July 1, 2019, Zueger, who was in his bedroom with his wife on the main floor of their home, heard a loud bang

-1-

followed by a crash coming from the basement. The basement area had a sliding door entrance, and his two teenage children, Isabel and E.Z., were sleeping in their bedrooms in the basement. After hearing the crash, Zueger put on his glasses and went to the basement, where he turned on a hallway light and observed a person in the common room area of the basement stumbling toward him. The light in the common room was not on, and Zueger assumed this person had tripped over an ottoman in the middle of the common room. Zueger began yelling at the intruder to leave and noticed that the sliding glass door to their backyard was open. Zueger also noticed that the intruder was carrying a shovel at his side with a handle that appeared to be about four feet long.

[¶4.] The intruder moved into the lighted hallway area until he was just a few feet away from Zueger. The intruder then turned away from Zueger, lifted the shovel from his side, and flipped it over his back, where it hung over his shoulder on his right side. The intruder walked away from Zueger toward a smaller study room in the basement while Zueger continued yelling loudly at him to get out of the house. Zueger's son, E.Z., was awakened by the commotion and came out of his bedroom. E.Z. walked down the bedroom hallway toward the entry to the study room where the intruder was located. Zueger testified that E.Z. and the intruder "surprised" each other when E.Z. saw the intruder come out of the room. E.Z. put his fists up in a fighting stance, and the intruder brought the shovel across the front of his body in a "shielding" position. When E.Z. noticed the shovel, he backed away and moved toward his father until they were standing next to one another near the

basement stairs. Zueger's wife, Kristen, called 911 and remained on the phone with dispatch throughout the remainder of the encounter.

[¶5.] The intruder then moved to the bar area of the basement, and E.Z. picked up a guitar that was nearby, lifted it above his shoulder like a baseball bat, and "pumped" it at the intruder to try to scare him away. The intruder left the basement through the sliding glass door, taking the shovel he was carrying with him. Zueger quickly shut the sliding door and managed to secure it even though the lock was damaged. While he was doing so, his daughter, Isabel, came out of her room after having been awakened by the noise. Zueger testified that the time that had elapsed from when he first saw the intruder to when the intruder left the house was approximately 45 seconds to one minute and 15 seconds.

[¶6.] After the intruder left the house, Kristen gave Zueger the phone and he spoke to 911 dispatch. Zueger described the intruder to the dispatcher as a Hispanic male with very short hair and many non-colored tattoos. Further, Zueger reported that the intruder was not wearing a shirt and was carrying a spade-like shovel.

[¶7.] Unsure if there were other intruders in the home, the family secured themselves in an inner room to wait for law enforcement to arrive. From a window, they could see a dark colored bike laying near the sliding glass door through which the intruder had fled. They were unsure at the time if it was one of the family members' bikes, but later determined that it was not. When law enforcement arrived around 5:00 a.m., they cleared the home to make sure it was safe, interviewed the family, took photographs of the sliding door, and took DNA swabs

from the handles of the dark colored bike. It appeared that the sliding glass door had been pried open and the intruder had entered the house through it, leaving the bike laying outside and failing to take the bike with him when he fled. During his interview with law enforcement, in addition to the details he described to the 911 dispatcher, Zueger described the intruder as a tall male (around 6'1") with a muscular build, barefoot, and wearing baggy gray shorts.

[¶8.] A couple of hours later, construction workers at a site about a quarter mile from the Zuegers' house contacted law enforcement, reporting that there was a man sleeping in one of the construction trucks that had been left at the site overnight. The truck was locked with the man inside. Law enforcement officers responded and were able to get the man out of the truck without incident. The man, identified as Anthony Red Cloud II, was handcuffed and placed in the back of a police car. Red Cloud was Native American with a buzz cut and many black tattoos, and he was wearing wet, gray sweatpants but was not wearing a shirt or shoes. Based on the similarity of Red Cloud's appearance to the intruder described by the Zuegers and his close proximity to their house, law enforcement decided to see if the Zuegers could identify Red Cloud as the person who had been in their basement earlier that morning.

[¶9.] Officer Brian Rhinewald went to their home, finding only Zueger and Isabel present. He informed them that law enforcement officers had detained a man that may or may not fit the description of the intruder and asked if Zueger would accompany him to see if he could identify the individual. Zueger agreed, and Officer Rhinewald drove them to the construction site where Red Cloud had been

arrested. They arrived around 8:00 a.m., and two police officers removed Red Cloud, who was handcuffed, from the back of their police vehicle and brought him to the front of the police car in which Zueger was sitting in the passenger seat. Upon seeing Red Cloud from the front, from a distance of approximately 30–45 feet, Zueger said he was 90–95% sure that Red Cloud was the intruder. Zueger asked to see Red Cloud's back. After the officers turned Red Cloud around and Zueger saw the tattoos on Red Cloud's back, he stated that he was 110% sure that he was the intruder. Law enforcement also showed Zueger two shovels that were at the construction site, but Zueger did not believe either of them was the shovel carried by the intruder in his basement. Regardless, law enforcement took DNA swabs from the handles of both shovels for testing.

[¶10.]     The State charged Red Cloud by complaint and information with three alternative counts of first-degree burglary, two counts of aggravated assault (one as to Zueger and one as to E.Z.), two counts of simple assault, and one count of criminal entry of a motor vehicle.[1] Additionally, the State filed a part II information alleging Red Cloud was a habitual offender having two prior felony convictions for robbery in 1994. Red Cloud filed a motion to suppress Zueger's identification of him on the day of the intrusion and also Zueger's subsequent in-court identification at the preliminary hearing. The circuit court held a hearing on Red Cloud's motion on January 28, 2020, at which Zueger testified to the intrusion and his identification of Red Cloud. Officer Blake Davis testified to Zueger's reported description of the intruder prior to the show-up identification of Red Cloud

---

1.     The State did not present evidence at the preliminary hearing regarding the criminal entry of a motor vehicle charge and it was not bound over for trial.

at the construction site, and Officer Rhinewald testified to Zueger's identification of Red Cloud in the show-up identification. The circuit court denied Red Cloud's motion in a memorandum decision and order dated February 14, 2020, concluding that while the identification was suggestive, the effect of the suggestive procedure was "outweighed by the accuracy and reliability of the eyewitness identification and the timing of the show up."

[¶11.] Red Cloud's jury trial began on July 14, 2020. Zueger, Kristen, Isabel, and E.Z. all testified regarding their observations on the night of the intrusion. Although their stories were largely the same, Red Cloud established several inconsistencies on cross-examination, including that Zueger testified that the shovel Red Cloud was holding had a normal handle, while Kristen and E.Z. testified it had a long, metal spike on the end where the handle would have been; and that Zueger, Isabel, and E.Z. testified that the overhead corridor lights were on in the basement, while Kristen testified that they were not. In addition, Zueger estimated that the incident lasted between 45 seconds to one minute and 15 seconds, whereas E.Z. testified that his interaction with the intruder lasted for "20 seconds maximum."

[¶12.] Additionally, several law enforcement officers testified about the investigation of the incident and/or Zueger's identification of Red Cloud. Taylor Ripley, a state forensic laboratory scientist, testified that he received swab samples taken from the bike left outside the Zuegers' basement sliding glass door and from the two shovels found at the construction site. Ripley was unable to get a usable DNA sample from either of the swabs taken from the shovels but was able to get a DNA sample from the bike swabs. Ripley compared this sample to a sample from

Red Cloud and determined it to be a match. The State entered Ripley's report into evidence as Exhibit 15 without objection from Red Cloud. However, Ripley took Exhibit 15 with him when he left the courtroom, and no one realized that it was missing until after the jury had reached its verdict.

[¶13.] The jury found Red Cloud not guilty of one of the first-degree burglary counts and both of the aggravated assault counts. However, the jury determined that Red Cloud was guilty of two alternative first-degree burglary counts and the two counts of simple assault. Red Cloud brought a motion for a mistrial on July 27, 2020, after discovering that Exhibit 15 had not been given to the jury. The circuit court denied the motion, holding that although the failure to submit Exhibit 15 to the jury was error, it was not prejudicial because the state lab technician testified to the contents of Exhibit 15 and was subjected to cross-examination shortly before the case was submitted to the jury. The circuit court further determined that even if the error did have an effect on the jurors, it did not rise to a level that infringed on Red Cloud's substantive right to a fair trial.

[¶14.] Red Cloud's jury trial on the part II information was held on August 28, 2020. The State admitted certified copies of the judgments and sentences of conviction for two separate robberies, both sentences imposed on December 16, 1994. In support of its claim that Red Cloud was one and the same person previously convicted of these prior felonies, the State called Heather Specht, a South Dakota Forensic Lab employee who specialized in fingerprint evidence. Specht testified that she compared Red Cloud's fingerprints from his arrest for the Zueger burglary to the two sets of fingerprints from his arrests resulting in the 1994

convictions. Based on this comparison, she concluded that all three sets of fingerprints were made by the same individual. The State rested its case-in-chief after Specht's testimony.

[¶15.]     Red Cloud moved for judgment of acquittal on the basis that the State had failed to produce any evidence that Red Cloud was discharged from his sentences imposed on the 1994 robberies within the last 15 years as required by SDCL 22-7-9. The State responded that it was only required to prove the elements of SDCL 22-7-7 and -11. Additionally, the State argued that the judgments of conviction which were introduced into evidence established that Red Cloud received two consecutive 20-year sentences for the 1994 robberies. The State claimed that it "can be deduced therefrom that the defendant would have been discharged within the 15 years from the date of the offense in our matter." The circuit court denied Red Cloud's motion for judgment of acquittal, stating, "I do not believe that [SDCL] 22-7-9 is an element of the habitual offender statute that the jury has to find." The circuit court further concluded that Red Cloud was required to have raised this issue prior to trial via a motion to dismiss the part II information. Red Cloud had not filed a pretrial motion to dismiss. The jury found Red Cloud was a habitual offender having been convicted of two robberies in 1994.

[¶16.]     The circuit court sentenced Red Cloud on October 13, 2020, to 50 years in prison, ten suspended, on one count of first-degree burglary. The maximum sentence which could be imposed for this offense was enhanced to that of a Class 1

felony because of Red Cloud's habitual offender status.[2]  The circuit court gave Red Cloud 470 days credit for time served.  Red Cloud was additionally sentenced to 360 days in the county jail for each of the simple assault charges, which were fully satisfied by Red Cloud's credit for time served.

[¶17.]        Red Cloud appeals his conviction, raising the following issues which we restate as follows:

> 1.        Whether the circuit court erred by denying Red Cloud's motion to suppress Zueger's show-up identification.
>
> 2.        Whether the circuit court erred in not granting a mistrial because Exhibit 15 was not submitted to the jury during their deliberations.
>
> 3.        Whether the circuit court erred in denying Red Cloud's motion for judgment of acquittal during trial on the part II habitual offender information.

**Analysis and Decision**

***Show-Up Identification of Red Cloud as Intruder***

[¶18.]        Red Cloud argues that his due process rights were violated by Zueger's identification of him in that the one-person show-up identification was "unnecessarily suggestive and conducive to irreparable mistaken identification[.]" (quoting *Neil v. Biggers*, 409 U.S. 188, 196, 93 S. Ct. 375, 380, 34 L. Ed. 2d 401 (1972)).  Red Cloud contends that the identification procedure was impermissibly suggestive in that he was the only potential suspect shown to Zueger, was handcuffed, was escorted by two police officers, and emerged from the back of a

---

2.      Because the second count of first-degree burglary for which Red Cloud was convicted was an alternative count, the circuit court did not impose a sentence on that count.

police vehicle to be identified. Further, he submits that there were no exigent circumstances necessitating a show-up identification because he had already been arrested for being in the construction vehicle and because a photo lineup for a different investigation was created with his photo within a few hours of the show-up identification.

[¶19.] Moreover, Red Cloud argues that, under the totality of the circumstances, the identification "created a [very] substantial likelihood of irreparable misidentification." (quoting *Neil*, 409 U.S. at 201, 93 S. Ct. at 383). In support of this argument, Red Cloud argues that Zueger had a limited opportunity to observe the intruder during the crime; that his degree of attention to the intruder was hindered by alarm for himself and his family; that Zueger testified that he focused on the shovel the intruder was holding rather than on the intruder himself; that the encounter was brief; and that Zueger's description of the intruder contained several inaccuracies when compared to Red Cloud. Red Cloud further asserts that even though Zueger expressed a high degree of certainty that Red Cloud was the intruder in his identification, that certainty does not outweigh the other negative indicators of reliability and is a poor gauge of accuracy.

[¶20.] The State, in response, does not appear to contest that the show-up identification was inherently suggestive and unnecessary because although it recites the circuit court's finding that the identification was suggestive, it does not present arguments negating that finding. The State instead argues that under the totality of the circumstances, Zueger's identification of Red Cloud was reliable and did not create a substantial likelihood of irreparable misidentification. The State

contends that Zueger, having been the victim of the crime, had a sufficient degree of attention to accurately describe the intruder; that his description of the intruder as compared to Red Cloud was generally correct; that the discrepancies emphasized by Red Cloud go to the weight, rather than the admissibility, of the identification; and that Zueger's certainty in his identification and the short time frame between the crime and the identification also weighs in favor of the reliability of the identification.

[¶21.] We review "the denial of a motion to suppress based on the alleged violation of a constitutionally protected right as a question of law by applying the de novo standard of review." *State v. Angle*, 2021 S.D. 21, ¶ 14, 958 N.W.2d 501, 506 (citation omitted). We review any underlying factual findings of the circuit court "under the clearly erroneous standard." *State v. Doap Deng Chuol*, 2014 S.D. 33, ¶ 19, 849 N.W.2d 255, 261 (citation omitted).

[¶22.] A defendant's due process rights may be violated "when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, 565 U.S. 228, 238–39, 132 S. Ct. 716, 724, 181 L. Ed. 2d 694 (2012) (citations omitted). If the identification procedure is both suggestive and unnecessary, the procedure is improper; thus, "the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* at 239, 132 S. Ct. at 724 (quoting *Neil*, 409 U.S. at 201, 93 S. Ct. at 383). The identification should only be suppressed if "the indicators of a witness'[s] ability to make an accurate identification are outweighed by the corrupting effect of law enforcement

suggestion[.]" *Id.* at 239, 132 S. Ct. at 725 (cleaned up). The policy underlying this approach is to "deter law enforcement use of improper lineups, showups, and photo arrays in the first place." *Id.* at 241, 132 S. Ct. at 726. Show-up identifications are inherently suspect: "[t]he practice of showing suspects singly to persons for purposes of identification has been consistently condemned as an affront to the requirements of due process and good police procedure." *State v. Reiman*, 284 N.W.2d 860, 871 (S.D. 1979) (citations omitted).

[¶23.] In *Neil*, the U.S. Supreme Court identified the factors that must be considered when determining if improper police conduct created a substantial likelihood of misidentification. 409 U.S. at 199, 93 S. Ct. at 382. The factors include the following:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199–200, 93 S. Ct. at 382.[3] If these factors show that the reliability of the identification outweighs the suggestive procedure used, the identification should be admitted. *Perry*, 565 U.S. at 239, 132 S. Ct. at 724.

[¶24.] Here, regarding the suggestiveness and necessity of Red Cloud's show-up identification, the State acknowledges that the "circuit court found the show up

---

3. Whether these factors truly capture the degree of likelihood of misidentification is unclear. As the U.S. Supreme Court acknowledged in *Perry*, referencing the amicus brief submitted by the American Psychological Association, there has been research since *Neil* was decided in 1972 "indicating that as many as one in three eyewitness identifications is inaccurate." 565 U.S. at 245, 132 S. Ct. at 728.

was inherently suggestive." The circuit court reasoned, regarding suggestiveness and necessity, that Red Cloud "was removed from the back of a patrol car, in handcuffs, and shown as a sole suspect to the victim, Mr. Zueger. In addition, testimony was introduced that a lineup or photo identification was available later that day." The circuit court also relied on *United States v. Hadley*, an Eighth Circuit Court of Appeals case, holding that "show-ups are inherently suggestive and ordinarily cannot be condoned when a line-up procedure is readily available." 671 F.2d 1112, 1115 (8th Cir. 1982). However, as the circuit court correctly observed, the court of appeals further held that "suggestive procedures, without more, do not require a holding that the due process clause has been violated." *Id.*

[¶25.] We agree with the circuit court that Red Cloud's identification procedure was suggestive and that conducting a show-up identification was unnecessary considering that a six-person photo lineup containing Red Cloud's picture was used in a separate investigation just a few hours after the show-up identification. We therefore consider the *Neil* factors to determine whether, under the totality of the circumstances, Red Cloud's suggestive and unnecessary show-up identification created a substantial likelihood of misidentification.

*The opportunity of the witness to view the criminal at the time of the crime*

[¶26.] At trial, Zueger testified that the intruder was in the basement between 45 seconds and one minute 15 seconds. During this time, the intruder was moving into and out of the lighted corridor area and the other areas of the basement with varying degrees of light, including the common room area, the study room, and the bar area. This means that within the estimated 45 to 75 seconds that the

intruder was in the basement, Zueger was only able to view the intruder in full light for a fraction of that time.

[¶27.]    In *Doap Deng Chuol*, we determined that the witness had sufficient and "ample opportunity" to observe the defendant because the witness had multiple, minutes-long interactions with the defendant, had given the defendant rides home in her car, and had spent time socially with the defendant. 2014 S.D. 33, ¶ 23, 849 N.W.2d at 261. Although Zueger's encounter with Red Cloud was very brief, at one point, he was within four feet of Red Cloud and able to view his shirtless and tattooed back in the basement corridor light. This view of Red Cloud allowed Zueger to make his identification with certainty when the officer showed him Red Cloud's tattooed back. At other points in the encounter, Zueger was able to view Red Cloud from varying angles in varying degrees of light. Although Zueger's encounter did not provide the same opportunity for observations as the witness had in *Doap Deng Chuol*, each case is factually unique, and we determine that the evidence detailing Zueger's observations was sufficient to support the identification.

*The witness's degree of attention*

[¶28.]    Zueger testified at trial that he was anxious and feared for his family's safety during the intrusion. His attention was also divided between the intruder and the shovel that the intruder was carrying. He testified that:

> while [the intruder] was in the basement I was so focused on the shovel and watching the shovel out of fear for what might be done with the shovel. That when it got slung over his shoulder, he rotated away. I felt like I got a decent look at his back and I recalled at that point that there was tattooing on not only around his neck, but on one side more than the other[.]

Zueger expounded on the experience, testifying, "I will tell you that my eyes were on the shovel almost exclusively. I was not assessing the person in any detail close enough to identify anything like a scar, mark, or anything like that."

[¶29.]     Red Cloud contends that Zueger's focus on the shovel negatively impacts the reliability of his identification. To support his argument, Red Cloud relies on *State v. Harris*, in which the Connecticut Supreme Court discussed the "'weapon focus' effect" which is "a phenomenon whereby the reliability of an identification can be diminished by a witness'[s] focus on a weapon[.]" 191 A.3d 119, 131 (Conn. 2018) (cleaned up). Red Cloud argues that according to the Connecticut court, "[w]eapon focus refers to the visual attention that eyewitnesses give to a perpetrator's weapon during the course of a crime. It is expected that the weapon will draw central attention, thus decreasing the ability of the eyewitness to adequately encode and later recall peripheral details." *Id.* (quoting N. Steblay, *A Meta-Analytic Review of the Weapon Focus Effect*, 16 L. & Hum. Behav. 413, 414, 420 (1992) (concluding that the "presence of a weapon does make a significant difference in eyewitness performance")).

[¶30.]     In *Doap Deng Chuol*, we determined that the witness, who was a confidential informant for law enforcement, had a sufficient degree of attention as she "was not a bystander or casual observer." 2014 S.D. 33, ¶ 24, 849 N.W.2d at 261–62. Here, Zueger was not a bystander or casual observer, and while his attention may also have been claimed by the shovel the intruder was carrying, that attention helped him identify the intruder from the back—when the intruder slung the shovel over his shoulder and down his back, he drew Zueger's attention to the

intruder's distinctive tattoo pattern on his back and neck. Overall, Zueger's degree of attention during the encounter was sufficient to support the reliability of his identification.

*The accuracy of the witness's prior description of the criminal*

[¶31.]     Zueger's prior description of the intruder was largely accurate when compared to Red Cloud's characteristics. Zueger described the intruder as having a muscular build, being shirtless and shoeless, having very short, cropped hair, and having many grayscale tattoos—all descriptors matching Red Cloud. However, Zueger initially described the intruder as Hispanic, wearing baggy shorts, and being taller than him, while Red Cloud is Native American, was wearing full-length sweatpants, and is 5'11," the same height as Zueger.

[¶32.]     Although each case must be considered on its distinct facts, we have previously considered the accuracy of victim identifications in other cases, which are instructive here. In *Reiman*, we emphasized that "a unique physical feature" like a "drooping eyelid" or a "bald head and tat[t]ooed arm" "renders identification easier for the witness." 284 N.W.2d at 872 (citation omitted). In *Doap Deng Chuol*, we determined that the witness's description was "sufficiently accurate" despite some discrepancies in her recollection of the color of the defendant's clothing and his height because her description was generally accurate. 2014 S.D. 33, ¶ 25, 849 N.W.2d at 262. We concluded that "these discrepancies go to the weight of the evidence and not to the sufficiency of [the] testimony to support [the identification's] admissibility." *Id.* Overall, Zueger's prior description of the intruder was sufficiently accurate to weigh in favor of the reliability of his identification.

*The level of certainty demonstrated by the witness at the confrontation*

[¶33.] At the show-up identification, Zueger stated that he was 90–95% certain that Red Cloud was the intruder upon seeing Red Cloud from the front. After seeing Red Cloud's back, Zueger stated that he was 110% certain that Red Cloud was the intruder. Red Cloud critiques this factor by arguing that witness certainty is a poor gauge of accuracy, citing for support Justice Sotomayor's dissent in *Perry*, 565 U.S. at 263–65, 132 S. Ct. at 738–39, stating that "jurors place the greatest weight on eyewitness confidence in assessing identifications even though confidence is a poor gauge of accuracy[.]"[4] However, we determine that Zueger's identification was sufficiently reliable even without consideration of this factor and therefore decline to address it further.

*The length of time between the crime and the confrontation*

[¶34.] The basement encounter occurred shortly before 5:00 a.m., and Zueger's identification occurred at approximately 8:00 a.m. the same day. The length of time between the crime and the confrontation was approximately three hours. In *Reiman*, we concluded that ten days between the crime and confrontation

---

4. Recent research supports Red Cloud's argument that eyewitness certainty may not be a good indicator of identification reliability, and some states, including Vermont, Kansas, and Utah, have formally abandoned consideration of this factor for that reason. *See State v. Discola*, 184 A.3d 1177, 1189 (Vt. 2018); *State v. Ramirez*, 817 P.2d 774, 781 (Utah 1991), *holding clarified by State v. Antonio Lujan*, 459 P.3d 992, 999–1000 (Utah 2020) (recognizing that the new Utah Rule of Evidence 617 created an evidentiary standard for assessing the reliability and admissibility of eyewitness identifications with *Ramirez's* due process considerations as a constitutional backstop—this new evidentiary standard does not include consideration of witness certainty in the reliability analysis); *State v. Hunt*, 69 P.3d 571, 575–76 (Kan. 2003) (adopting the *Ramirez* constitutional analysis before its clarification in *Antonio Lujan*).

was not "unreasonably remote" so as to call the reliability of the identification into question. 284 N.W.2d at 872. Therefore, the short length of time between the crime and Zueger's identification of Red Cloud supports the reliability of the identification.

*Weighing all factors under the totality of the circumstances*

[¶35.] Considering all but the certainty factor, Zueger's identification of Red Cloud was reliable and did not create a substantial likelihood of irreparable misidentification. Although Zueger did not have an extensive opportunity to observe the intruder and his attention was divided between the intruder and the shovel the intruder was carrying, Zueger's description was still generally accurate when compared to Red Cloud's characteristics. This accuracy, in addition to only three hours having passed between the crime and Zueger's identification of Red Cloud, renders his identification sufficiently reliable.

[¶36.] While we have determined that under the *Neil* factors, Zueger's identification of Red Cloud was sufficiently reliable to outweigh the suggestive and unnecessary nature of the show-up identification conducted, we take this opportunity to discourage the unnecessary use of this type of identification process by law enforcement. It is advantageous to use a more reliable process, such as a photo line-up, when it is reasonably possible to do so. The penalty for failure to do so may be suppression of the impermissible identification.

*Exhibit 15*

[¶37.] Red Cloud argues that the circuit court's failure to send Exhibit 15 to the jury was prejudicial error and that the court abused its discretion by not

granting Red Cloud's motion for a mistrial on that ground. Red Cloud contends that he was prejudiced because the jury was deprived of the opportunity to consider the contents of the exhibit, which specifically documented that Red Cloud's DNA was not found on either shovel handle tested. Red Cloud argues that this was a "major fact" that "in all probability, produced some effect on the verdict."

[¶38.] The State responds that Red Cloud was not prejudiced by the error because Exhibit 15, even if sent to the jury, was only partially supportive of Red Cloud's arguments while also containing damaging evidence against him. Additionally, the State argues that the DNA expert who authored the report testified to both the bicycle and shovel results before the jury and that the information was fresh in the jurors' minds due to the short trial and the DNA expert being the last witness to testify. Therefore, the State argues that while failing to send Exhibit 15 to the jury for its consideration was error, it did not prejudice Red Cloud.

[¶39.] "The denial of a motion for mistrial will not be overturned unless there is an abuse of discretion. Motions for mistrial are within the discretion of the trial judge and will not be granted unless there is a showing of actual prejudice to the defendant." *State v. Thomas*, 2019 S.D. 1, ¶ 27, 922 N.W.2d 9, 17 (citations omitted). When a circuit court examines whether to grant a mistrial, it must find error "which, in all probability, produced some effect upon the jury's verdict and is harmful to the substantial rights" of the defendant in order to grant the mistrial. *Id.* (citations omitted).

[¶40.] Here, the circuit court stated in response to the motion for a mistrial:

> I agree that there was error there. I don't find it has an effect on the jurors. Even if it did have an effect on the jurors, it would not rise to the level that it infringes the defendant's substantial rights to a fair trial in this case. So I'm going to deny that motion for a mistrial.

Based on our review of the record, we conclude that the circuit court did not abuse its discretion. The last witness to testify in Red Cloud's trial was the DNA expert, who explained the contents and conclusions in Exhibit 15. Exhibit 15 did provide that the DNA results on the two shovels were inconclusive; however, the DNA expert testified to those results and was cross-examined by Red Cloud regarding the two shovel swabs and their inconclusive results. And, regardless, Zueger had testified that neither of the shovels tested looked like the one he saw the intruder holding. Moreover, Exhibit 15 revealed that Red Cloud's DNA *matched* that on the bicycle found outside the Zuegers' sliding glass door. Therefore, it was not an abuse of discretion for the circuit court to determine that the exclusion of Exhibit 15 from jury deliberations, while error, did not warrant a mistrial.

### *Part II Habitual Offender Information*

[¶41.] Red Cloud contends that the circuit court erred in denying his motion for judgment of acquittal made after completion of the State's case-in-chief at his part II habitual offender trial. Red Cloud argues that the State failed to produce any evidence that Red Cloud had been discharged from prison, jail, probation, or parole for either of his two prior felonies within "the fifteen-year time period required by SDCL 22-7-9." The circuit court determined that this time period was for the court to decide, not a factual determination for the jury, and that the issue should have been brought in a motion to dismiss prior to trial. Red Cloud argues in

response that he could raise the issue at any time because *State v. Loop*, 422 N.W.2d 420, 424 (S.D. 1988), allows a defendant to attack the validity of a prior conviction pretrial or at trial. Yet, Red Cloud also argues that because whether he was released from supervision within the last 15 years is a question of fact, the State was required to present evidence to the jury showing compliance with SDCL 22-7-9.

[¶42.] The State responds that it was not required to prove at the jury trial that Red Cloud had been released from supervision within the last 15 years; rather, the "sole issue in habitual offender cases is whether the defendant is the same person as alleged in the habitual criminal information." (quoting *State v. Moves Camp*, 376 N.W.2d 567, 570 (S.D. 1985) (cleaned up)). Although the State acknowledges that SDCL 22-7-9 provides that a prior conviction cannot be considered unless the defendant was discharged from supervision within 15 years of the date of the principal offense, the State argues that it was not required to prove compliance with this requirement at trial.

[¶43.] Under SDCL 22-7-12, a defendant has a "right to a trial by jury *on the issue of whether the defendant is the same person as alleged in the habitual criminal information*." (Emphasis added.) Applying this statute, this Court noted in *State v. Garritsen* that "the only issue" in a habitual offender trial "is whether the defendant is the same person as alleged in the habitual criminal information . . . ." 421 N.W.2d 499, 501 (S.D. 1988) (cleaned up); *accord Moves Camp*, 376 N.W.2d at 570. Therefore, the circuit court properly rejected Red Cloud's contention that the jury must determine whether his prior convictions could be considered under SDCL 22-

7-9. Likewise, the court did not err in denying Red Cloud's motion for judgment of acquittal on this basis. *See Doap Deng Chuol*, 2014 S.D. 33, ¶ 36, 849 N.W.2d at 264 (reviewing the denial of a motion for judgment of acquittal de novo).

[¶44.] However, this does not answer Red Cloud's additional claim that even if the jury does not determine the State's compliance with SDCL 22-7-9, the circuit court erred in concluding that he was required to file a motion to dismiss the part II information prior to trial to preserve the issue for the court's review. Under SDCL 22-7-9, a prior conviction may only be considered for purposes of enhancing a defendant's sentence via a habitual offender information if the defendant was "on such prior conviction, discharged from prison, jail, probation, or parole within fifteen years of the date of the commission of the principal offense." This Court has "interpreted SDCL 22-7-9 to be a limitations statute designed to preclude the use of stale convictions." *Perdue v. State*, 341 N.W.2d 382, 383 (S.D. 1983). Thus, a prior conviction that falls outside the parameters of SDCL 22-7-9 may not be used to enhance a sentence.

[¶45.] In *Loop,* we explained that "[a] defendant has two opportunities to have prior convictions, offered for enhancement purposes, set aside"—"at a pretrial hearing, or at the trial on the Count 2 information." 422 N.W.2d at 424, *holding overruled in part by State v. Chant*, 2014 S.D. 77, ¶ 12, 856 N.W.2d 167, 170 (holding "that a defendant may only collaterally attack prior convictions used for enhancement if he or she was unrepresented by counsel when pleading guilty"). While *Loop* concerned a challenge, on constitutional grounds, to the validity of prior convictions, the case nevertheless stands for the proposition that when the State

seeks to use a prior conviction that might not otherwise be valid for enhancement purposes, a defendant may challenge the State's use of that conviction at a pretrial hearing or in trial. Thus, the circuit court's contrary determination that Red Cloud could only raise the issue in a pretrial motion to dismiss was erroneous.

[¶46.] Because Red Cloud raised the issue at trial, it was incumbent upon the court to determine whether the issue had merit *before sentencing* Red Cloud on the habitual offender information. However, reversal is not necessary here because a review of the record before the circuit court at the time of sentencing does not support Red Cloud's contention that the two prior robbery convictions were improperly considered for enhancement purposes. According to his presentence investigation report (PSI), Red Cloud was released from supervision on both prior felony robberies on May 1, 2018. Red Cloud's counsel advised the court at the sentencing hearing that he had "no additions or corrections" to the PSI. Importantly, Red Cloud did not assert to the circuit court that he *was in fact discharged* more than 15 years prior to the date of his principal offense. He likewise fails to advance such a contention on appeal. Given this record, although the circuit court erred in not ruling on the issue, the error was harmless beyond a reasonable doubt because the record supports that Red Cloud's 1994 conviction could be used for enhancement purposes. *See* SDCL 23A-44-14 ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.").

[¶47.] JENSEN, Chief Justice, and DEVANEY and MYREN, Justices, and PORTRA, Circuit Court Judge, concur.

[¶48.]    SALTER, Justice, deeming himself disqualified, did not participate.

[¶49.]    PORTRA, Circuit Court Judge, sitting for SALTER, Justice, disqualified.