#30191-a-MES
**2023 S.D. 71**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                     Plaintiff and Appellee,

    v.

ELIAS RICHARD,                              Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CRAIG A. PFEIFLE
Judge

* * * *

GREGORY J. SPERLICH
KYLE BEAUCHAMP of
Colbath and Sperlich
Rapid City, South Dakota                   Attorneys for defendant
                                  and appellant.


MARTY J. JACKLEY
Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota                        Attorneys for plaintiff and
                                  appellee.

* * * *

ARGUED
OCTOBER 5, 2023
OPINION FILED **12/28/23**

#30191

SALTER, Justice

[¶1.]       A jury found Elias Richard guilty of second-degree murder for the shooting death of Vernall Marshall.  Prior to trial, the circuit court denied Richard's motion in limine to preclude any reference to Richard's gang affiliation.  At trial, the defense sought to emphasize a co-defendant's control over the murder weapon, in part, by stating at the beginning of the trial that the empty shell casings found at the scene of the murder matched others discovered at the co-defendant's apartment.  However, it became apparent during the testimony of a police detective that the State had not disclosed a forensic report which concluded that the shell casings found at the crime scene did *not* match the shell casings at the co-defendant's apartment.  Defense counsel moved for a mistrial, which the court denied.  Richard appeals, arguing the circuit court abused its discretion in denying both his motion in limine regarding evidence of gang affiliation and his motion for mistrial.  We affirm.

## Factual and Procedural History

[¶2.]       On Christmas Eve 2020, Kaleb Lukkes, Masheka Barnett, Brandi Snowfly, and Brandi's children were at a Walgreens in Rapid City picking up last-minute Christmas gifts.  While they were shopping, Barnett became upset because she received a message from her minor daughter indicating Vernall Marshall had sent her text messages that referenced illegal drugs and sex.

[¶3.]       Around the same time, Vernall had also sent a message to Snowfly via Facebook Messenger, asking to buy methamphetamine from her.  During her testimony, Barnett described these communications with Vernall as coincidental.

-1-

Lukkes saw the drug deal as an opportunity to confront Vernall about the text messages sent to Barnett's daughter, so he arranged a meeting using Snowfly's messenger account.[1]

[¶4.] After Lukkes dropped Snowfly and her children off at the apartment he shared with her, he and Barnett left in Snowfly's car and picked up Clint Marshall[2] and Elias Richard en route to meet Vernall, purportedly to sell him drugs. Lukkes, Clint, and Richard were members of a gang known as the Dark Side Family. Lukkes testified he provided Richard with a loaded .25 caliber pistol and instructed him to use the gun to scare Vernall.[3]

[¶5.] After Vernall got into the back seat and handed Lukkes the money for the drugs, Richard and Clint began assaulting him. Lukkes stopped the car and removed Vernall. Barnett remained in the passenger seat of the car as the three men continued the assault until, according to Lukkes, Richard used the pistol to shoot Vernall twice in the back. Lukkes, Barnett, Clint, and Richard fled the scene in Snowfly's car and left Vernall who was mortally wounded and later died from his injuries.

---

1.    According to the evidence at trial, both Lukkes and Snowfly, who were dating at the time, were known to sell methamphetamine and both had access to Snowfly's Facebook account.

2.    Clint Marshall testified that he later became aware that Vernall was his cousin. Because both men have the same surname, we refer to them by their first names.

3.    Lukkes testified that his purpose in picking up Vernall was to question him about the messages he sent to Barnett's daughter. Defense counsel, however, suggested that Lukkes' purpose was to collect past due drug debts.

[¶6.]     Lying in the street with Vernall's body was a broken piece of a vehicle's red taillight, which police recovered as evidence from the crime scene along with several other items, including two spent .25 caliber shell casings. A nearby resident had reported seeing a white car drive away immediately after hearing two gun shots, but detectives were otherwise without strong initial investigative leads. They learned of Vernall's identity through a tribal identification card located in his wallet, and officers were able to make contact with Vernall's girlfriend.

[¶7.]     In the following days, detectives learned that Vernall was a periodic drug user, and they sought to locate people he associated with who might have additional information that could assist in the ongoing investigation. By reviewing some of Vernall's electronic messages, detectives discovered references to the Sundial Apartments and the name of a person who lived there.

[¶8.]     When investigators arrived at the Sundial Apartments parking lot, they observed, purely by chance, a white Ford Fusion with a piece broken out of a taillight. The detectives diverted from their original plan to interview one of Vernall's associates. Instead, they retrieved the taillight piece recovered from the scene of Vernall's murder and found that it fit perfectly into the broken taillight on the Ford Fusion.[4] The car had vanity plates bearing the word, "SNOWFLY," and detectives quickly confirmed that the car was registered to Brandi Snowfly who also lived at the Sundial Apartments with Lukkes.

_____

4.     The evidence at trial did not explain how the taillight had been broken, only that Vernall's assault and shooting occurred at the rear of the parked car and near the area of the broken taillight.

[¶9.]    The detectives interviewed Lukkes and Snowfly, and they later executed a search warrant for the Snowfly/Lukkes apartment where they discovered drugs and paraphernalia as well as six spent shell casings which an officer initially believed came from .25 caliber ammunition. Officers also interviewed Clint and Barnett, and though the four stories were inconsistent in some respects, officers determined they had probable cause to arrest Richard for Vernall's murder.

[¶10.]    Ultimately, Lukkes, Barnett, Clint, and Richard were indicted for their involvement in Vernall's death. As to Richard, the grand jury returned an indictment charging him with one count of first-degree murder under a premeditation theory, in violation of SDCL 22-16-4(1).[5] He pled not guilty, and his case was tried to a jury.[6]

[¶11.]    Prior to trial, Richard filed a motion in limine to preclude any evidence related to Richard's membership with the Dark Side Family gang.[7] The State's

---

5.    A grand jury had originally also indicted Richard with one count of aiding and abetting first-degree robbery. But a superseding indictment was issued approximately four months later that only listed the count of first-degree murder.

6.    Clint entered into a plea agreement with the State under which he pled guilty to aiding and abetting aggravated assault. Barnett also entered into a plea agreement under which she pled guilty to misprision of a felony, possession of a controlled substance, and admitted to a part II information. Lukkes was indicted on counts of aiding and abetting first-degree murder and aiding and abetting aggravated assault. He cooperated with the State and testified at Richard's trial without the benefit of a plea agreement, but he eventually reached an agreement under which he pled guilty to aiding and abetting aggravated assault.

7.    Richard often refers to this as a motion to preclude evidence of his alleged gang membership. We understand this to mean that Richard did not admit to being a member of the Dark Side Family. But strictly speaking, the State's

(continued . . .)

theory was that Clint and Richard became involved in the effort to confront Vernall about the inappropriate messages to Barnett's daughter at Lukkes' request because all three were members of the Dark Side Family. The court denied the motion in limine but cautioned the State to avoid suggesting to the jury that gang members, solely by virtue of their membership, are violent. Instead, the State was to keep any evidence of gang affiliation tailored to a motive to act at another member's request. The court noted that the evidence appeared to suggest the men were not otherwise engaged with each other on the evening of December 24, 2020, and the State had argued their common gang membership helped explain the reason for them mustering at Lukkes' request.

[¶12.] At trial, the gang affiliation evidence did not play a central role in the State's case, and the prosecutor generally used the evidence to explain the Lukkes/Clint/Richard confederation. On direct examination, Lukkes testified that he was a member of the Dark Side Family and verified that his tattoos attested to his membership. He confirmed that both Clint and Richard were also members of the Dark Side Family, which Lukkes described as a "brotherhood."[8] He agreed with the prosecutor that membership in the gang impacted each member's relationship with one another in the sense that a member would be more willing to do something for another member than he would for a non-member. For example, if a member

_____

(. . . continued)
    evidence was not that Richard was alleged to be a member of the gang—it
    was that Richard *was* a member of the gang. For this reason, we have not
    restated the "alleged" qualifying adjective.

8.    Clint acknowledged that he was a member of the gang, but when he was
    asked whether Richard was a member, he responded, "Not that I can recall."

had a disagreement with another person, Lukkes explained that gang members would "probably go beat them up."

[¶13.] The defense's theory of the case was that Lukkes, not Richard, had shot and killed Vernall. During defense counsel's opening statement, he told the jury that police had found six spent .25 caliber shell casings underneath Lukkes and Snowfly's bed at their apartment. Counsel claimed that these shell casings were of the same caliber as those found at the crime scene, in an apparent effort to suggest Lukkes' possession and control over the murder weapon. But the lead detective, Sergeant Barry Young, testified during direct examination that despite originally appearing to be .25 caliber shell casings, a firearms expert had issued a report in which he determined that the shell casings found under the bed were actually the remnants of ammunition for a .22 caliber firearm.

[¶14.] Shortly after Sergeant Young's testimony, counsel addressed the court outside the presence of the jury. Defense counsel informed the court that, despite the court's pretrial discovery order,[9] he had never seen the forensic report referenced by Sergeant Young, nor had the name of the firearms expert appeared on the State's witness list. Since he had told the jury during his opening statement that the casings found under the bed matched those found at the crime scene, defense counsel argued that he had lost credibility with the jury and, as a result, moved for a mistrial.

---

9. Prior to trial, the circuit court had granted Richard's discovery motion and ordered the State to "furnish, among other things, reports of experts and the nature of their testimony 30 days prior to trial."

[¶15.]     The State responded by asserting that it had produced all discovery in good faith and had also invited defense counsel, who declined, to the Attorney General's Office to review it.  The circuit court denied the motion for mistrial but asked both attorneys to search through their discovery records and advise the court the following morning whether the forensic report had, in fact, been provided.  At that point, the court stated it would readdress the motion.

[¶16.]     While Sergeant Young was still on the witness stand, defense counsel elicited testimony explaining that the mistaken belief about the caliber of the shell casings discovered at the apartment originated with the police.  Sergeant Young testified on cross-examination that the veteran police officer who had discovered the shell casings at the apartment identified them as .25 caliber casings.  And based upon that initial conclusion, Sergeant Young had, himself, indicated on a form sent with the shell casings to the lab for testing that they were from a .25 caliber firearm.  He originally requested the testing to determine if all of the spent shell casings had been fired from the same gun, but that inquiry ended when the shell casings recovered from the apartment turned out to be for a different caliber firearm.  After examining Sergeant Young, neither defense counsel nor the State mentioned the forensic report again.

[¶17.]     The next day, the State indicated it was unable to confirm that it had disclosed the forensic report.  Defense counsel, for his part, maintained that he had not received the report and renewed his motion for mistrial, reiterating that he "hung [him]self out in front of this jury" because he claimed in his opening statement that the shell casings were a match.  But the circuit court again denied

the motion. It found that the failure to disclose the report was inadvertent, not intentional, and had not prejudiced Richard as his counsel had suggested. Instead, it found the jury had "other issues upon which [it] is being asked to focus."

[¶18.] The balance of the remaining evidence at trial came primarily in the form of testimony from those involved before, during, or after Vernall's shooting, but not all of it was consistent. For instance, Lukkes stated that Barnett told him to "beat [Vernall] up[,]" but Barnett testified she did not tell Lukkes to do anything and was unaware of any plan to confront Vernall over the text messages sent to her daughter. And while Clint said that Lukkes simply asked him if he wanted to "go for a cruise and, you know, smoke a little bit," Lukkes testified that he had contacted Clint and Richard and told them he needed to "ask a guy some questions" and "asked if [they were] down for a ride." But each of their stories, in one form or another, pointed to Richard as the person who shot Vernall.

[¶19.] At the close of the testimony, the jury was instructed on the lesser included offense of second-degree murder at the State's request and over Richard's objection. The circuit court also instructed the jury that it could find Richard guilty of murder if it determined that he aided and abetted in Vernall's murder and acted with the requisite intent and was not merely present. During deliberations, the jury sent a note to the court asking for clarification as to whether Richard's "presence and participation count as the cause" of second-degree murder.[10]

---

10. In its response to the jury's question, the circuit court stated that it was unable to provide further instructions on the law and asked the jurors to read the court's instructions as a whole.

[¶20.]     The jury ultimately found Richard not guilty of first-degree murder but guilty of second-degree murder.  The circuit court imposed a mandatory sentence of life in prison without the possibility of parole.

[¶21.]     Richard appeals raising two issues for our review, which we have restated as follows:

> 1.     Whether the circuit court abused its discretion when it denied Richard's motion in limine and allowed evidence of Richard's gang affiliation.
>
> 2.     Whether the circuit court abused its discretion when it denied Richard's motion for mistrial based upon the State's failure to disclose evidence relating to the shell casings recovered from the Snowfly/Lukkes apartment.

## Analysis and Decision

### *Motion in Limine*

[¶22.]     "Our standard of review for evidentiary rulings requires a two-step process: first, to determine whether the trial court abused its discretion in making an evidentiary ruling; and second, whether this error was a prejudicial error[.]" *State v. Hankins*, 2022 S.D. 67, ¶ 20, 982 N.W.2d 21, 30 (citation omitted).

[¶23.]     As a starting point, all relevant evidence is admissible.  SDCL 19-19-402.  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  SDCL 19-19-401 (Rule 401).  But a court may exclude otherwise relevant evidence "where its probative force is substantially outweighed by a danger of unfair prejudice, among other considerations."  *Knecht v. Evridge*, 2020 S.D. 9, ¶ 22, 940 N.W.2d 318, 326 (citing SDCL 19-19-403 (Rule 403)).  We have explained that this "balancing . . . requires a disproportionate level of unfair

prejudice before relevant evidence may be excluded." *Id.* The moment evidence is found relevant, the scale "tips emphatically in favor of admission" absent its probative value being substantially outweighed by Rule 403 concerns. *Id.* (citation omitted). The circuit court has broad discretion when it engages in this balancing function. *Id.*

[¶24.] Here, the circuit court did not abuse its discretion. Under the facts of this case, Richard's gang affiliation was relevant in the Rule 401 sense because it helped explain Richard's involvement in confronting Vernall. The two men were otherwise not connected, and Richard had not been with Lukkes, Snowfly, and Barnett earlier when they became aware of Vernall's messages to Barnett's daughter. There was no apparent motive for Richard's aggression toward Vernall other than doing so at Lukkes' request as a component of the fraternal relationship among gang members, as Lukkes explained.

[¶25.] The court prudently recognized the risk of unfair prejudice and limited the State's use of the gang affiliation evidence. However, the risk of unfair prejudice alone is not enough to justify exclusion under Rule 403's balancing standard for admissibility. Instead, the risk must substantially outweigh the probative value of the evidence. And here, the court properly exercised its discretion to determine that it did not.

[¶26.] Richard presents a contrary argument and claims the gang affiliation evidence had no probative value, asserting that, "at best, only circumstantial evidence exists to support that Mr. Richard was even a gang member," noting that only Lukkes could definitively say that Richard was a member of the Dark Side

Family.[11]  However, evidence is probative if it has *any tendency* to make a fact in consequence more likely.  If true, Richard's gang affiliation would tend to explain the reason he accompanied Lukkes and Clint for the sole apparent purpose of assaulting Vernall.  The fact that Lukkes was the only witness who definitively identified Richard as a gang member does not make that fact any less probative under Rule 403, but rather implicates the weight that the jury might assign to it.

[¶27.]        Richard argues, alternatively, that even if evidence of his gang affiliation was probative, it was substantially outweighed by the danger of unfair prejudice.  He cites as support our decision in *State v. Hart*, where we held that statements about a victim's gang affiliation should not have been admitted, though we determined the admission of the evidence was harmless.  1996 S.D. 17, ¶ 17, 544 N.W.2d 206, 210.  Richard contrasts our harmlessness conclusion in *Hart* with this case and claims that the evidence of gang affiliation here was so prejudicial that it was not harmless.  But Richard misses an important distinction.  We determined that the gang affiliation statements relating to the victim in *Hart* were admitted in error because they were *irrelevant*, not because they were prejudicial.  *Id.* ¶ 16.  And we have never held that evidence of gang affiliation is categorically inadmissible.

[¶28.]        Richard also cites to a decision from the Eighth Circuit Court of Appeals for the proposition that gang affiliation evidence is inadmissible "if its purpose is solely 'to prejudice the defendant or prove his guilt by association with unsavory characters.'" *United States v. Gaines*, 859 F.3d 1128, 1131 (8th Cir. 2017)

---

11.    Though the law makes no distinction, there was, in fact, direct evidence of
       Richard's gang affiliation in the form of Lukkes' testimony.

(quoting *United States v. Ellison*, 616 F.3d 829, 833 (8th Cir. 2010)).  But the sole-purpose premise is not supported by the record here.  As indicated, gang affiliation in this case was relevant to explain Richard's motive for confronting Vernall on the evening of December 24, 2020.

[¶29.]　　　Because we hold the circuit court did not abuse its discretion when it denied Richard's motion in limine, our inquiry ends, and we need not determine whether Richard was prejudiced by evidence of his gang affiliation.

## *Motion for Mistrial*

[¶30.]　　　"The denial of a motion for mistrial will not be overturned unless there is an abuse of discretion."  *State v. Ortiz-Martinez*, 2023 S.D. 46, ¶ 26, 995 N.W.2d 239, 244 (quoting *State v. Red Cloud*, 2022 S.D. 17, ¶ 39, 972 N.W.2d 517, 530).  We have frequently held that "[w]hen a circuit court examines whether to grant a mistrial, it must find error 'which, in all probability, produced some effect upon the jury's verdict and is harmful to the substantial rights' of the defendant in order to grant the mistrial."  *Id.* (quoting *Red Cloud*, 2022 S.D. 17, ¶ 39, 972 N.W.2d at 530).

[¶31.]　　　However, in our opinion in *State v. Carter*, 2023 S.D. 67, ¶ 26, ___ N.W.2d ___, ___, also issued today, we clarified our prejudice standard in cases involving the decision to admit evidence which had, at times, stated the prejudice showing as one requiring a reasonable probability of a different outcome.  We now also apply this clarification to assessing prejudice in the context of a motion for mistrial:

> Because this Court has treated both formulations as expressing the same concept of prejudice, we conclude that the "all probability" phrase should be understood as "a reasonable probability that, but for [the error], the result of the proceeding

> would have been different." In other words, "a probability sufficient to undermine confidence in the outcome."

*Id.* ¶ 26 (cleaned up) (quoting *Owens v. Russell*, 2007 S.D. 3, ¶ 9, 726 N.W.2d 610, 615).

[¶32.] We have recently noted that "the circumstances prompting a mistrial motion, in many instances, do not involve judicial error, but rather some other irregularity that has occurred during the course of a trial." *Ortiz-Martinez*, 2023 S.D. 46, ¶ 27, 995 N.W.2d at 245. That was the genesis of this mistrial motion—noncompliance with a discovery order rather than a separate allegation of judicial error.

[¶33.] Likewise, "[w]hen a discovery order is violated, the inquiry is whether the defendant suffered any material prejudice as a result of the late disclosure." *State v. Krebs*, 2006 S.D. 43, ¶ 19, 714 N.W.2d 91, 98. The failure to produce evidence when ordered to do so is not itself prejudicial error. *Id.*

[¶34.] South Dakota's rules of criminal procedure require a prosecuting attorney to make available for inspection all its discovery upon a defendant's written request. *See* SDCL 23A-13-3 to -4. Here, the State complied with its statutory obligations, but it does not appear it complied with the circuit court's specific discovery order which required it to produce copies of all expert reports. We have not addressed whether complying with its statutory obligations under SDCL 23A-13-3 and -4 preempts the State's obligation to produce the same information in the manner required by a discovery order, and we need not do so here because Richard has not demonstrated prejudice.

[¶35.]     The inculpatory evidence relating to what turned out to be .22 caliber shell casings was not central to Richard's defense, which focused on uncontroverted evidence of Lukkes' ownership and control over the gun used to shoot Vernall. More to the point, the inculpatory evidence did not address the testimony of Lukkes and Clint who identified Richard as the person who shot Vernall. In this regard, Lukkes testified that he saw Richard shoot Vernall, and Clint testified that he saw two flashes from his right where Richard was standing as he heard the gunshots. And though Barnett was in the car, she testified that she saw Lukkes give Richard the gun and saw Richard later attempt to return it to Snowfly at her and Lukkes' apartment.

[¶36.]     Yet, Richard argues that the State's failure to turn over the forensic report "gutted" his trial theory. He cites to *Krebs*, where we reversed the defendant's manslaughter conviction after finding that the State's failure to disclose inculpatory evidence from a witness prejudiced the defense. 2006 S.D. 43, ¶ 23, 714 N.W.2d at 100. At trial, the defendant claimed that he had acted in self-defense. However, we held that this theory was "completely undercut" when one of the State's witnesses testified, without prior notice, that she observed Krebs and his friends engaging in lighthearted behavior after the killing and had also heard Krebs joke that "he killed before and he'd kill again." *Id.* ¶¶ 15, 20–21, 714 N.W.2d at 98–100.

[¶37.]     This case is much different. Regardless of whether the shell casings recovered from the Snowfly/Lukkes apartment matched those at the murder scene, Richard's defense theory remained intact. Indeed, Richard's theory had very little

to do with matching the shell casings at the scene with those recovered at the apartment in order to establish Lukkes' control over the gun. At trial, Lukkes admitted he owned the gun with Snowfly and had control of it on the fateful drive to meet Vernall. Lukkes admitted that he loaded the gun and handed it to Richard, telling him to "[u]se the gun to scare him so I can get the truth out of him." What remained was a credibility determination which required the jury to weigh the evidence that Lukkes gave the gun to Richard, not the existence of a ballistics expert's report. The circuit court appears to have reached the same conclusion when it denied Richard's motion for mistrial and stated that "there are other issues upon which this jury is being asked to focus[.]"

[¶38.]　　　And in the context of the entire trial, Richard used a variety of means to develop his defense theory that had nothing to do with the shell casings found in the apartment. For instance, Richard elicited testimony from witnesses to support the inference that Lukkes was devoted to Snowfly and would act to assist or intervene on her behalf or for one of her friends. Richard was also able to impeach Clint's credibility by eliciting Clint's admission that he was under the influence of alcohol and drugs when Vernall was shot and that his drug use would sometimes affect his ability to remember things. And Barnett testified that after the shooting, she heard Lukkes say that "we drop bodies and we'll drop bodies again."[12]

---

12. In her initial interview with law enforcement officers, Barnett reportedly told officers that she had heard Lukkes say, "*I* drop bodies and *I'll* drop bodies again." (Emphasis added). Defense counsel identified this discrepancy during his cross-examination of Barnett.

[¶39.] Still too, even if the jury determined Richard did not actually shoot Vernall, the State asserts that it could have, nevertheless, convicted him of murder under an aider and abettor theory. Richard claims that this argument was not made at trial and cannot be made now, but this argument overlooks the state of the record. The jury was instructed, without objection, that it could convict Richard of murder if it concluded someone else was the shooter so long as Richard aided and abetted the commission of the crime with the intent to do so. In fact, the jury seemingly considered the aider and abettor instruction specifically. During its deliberation, the jury sent a note to the circuit court in which it referenced the aider and abettor instruction and asked if "the defendant's presence and participation count as the cause[,]" presumably of death, listed as an element in the second-degree murder instruction. The jury was not required to identify Richard as a principal or an aider and abettor on its general verdict form.

[¶40.] Finally, Richard's argument that "counsel lost all credibility with the jury" overstates the impact of his opening statement as much as the forensic report's significance. Defense counsel was able to elicit an explanation about the different shell casings through its cross-examination of Sergeant Young, and neither party returned to the topic of the inconsistency over the course of the four-day trial.

[¶41.] In the end, the jury determined the relative weight for all of the evidence, passed on the State's request to convict Richard of first-degree murder, and, instead, convicted him of second-degree murder. In our view, the absence of the forensic report did not impact Richard's ability to present his defense theory

that Lukkes was the shooter. Therefore, Richard was not prejudiced as a result of the State's failure to disclose the inculpatory forensic report, and the circuit court did not abuse its discretion in denying Richard's motion for mistrial.

## Conclusion

[¶42.] Because we conclude the circuit court did not abuse its discretion in denying Richard's motion in limine or in denying his motion for mistrial, we affirm.

[¶43.] JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.